Jackie KLEINER, Plaintiff-Appellee,

v.

The FIRST NATIONAL BANK OF ATLANTA, Defendant-Appellant,

Hansell & Post, Richard Kirby and Richard M. Langway, Appellants,

George W. MOROSANI, Plaintiff-Appellee,

v.

The FIRST NATIONAL BANK OF ATLANTA, Defendant-Appellant,

Hansell & Post, Richard Kirby and Richard M. Langway, Appellants.

No. 83–8794.

United States Court of Appeals, Eleventh Circuit.

Jan. 31, 1985.

James C. Hill, Circuit Judge, filed separate opinion, concurring in part and dissenting in part.

Trammell E. Vickery, Kent E. Mast, William B. Smith, Emmet J. Bondurant, II, Eugene G. Partain, W. Gordon Hamlin, Jr., Atlanta, Ga., for Hansell & Post.

Robert B. Remar, Jerome J. Froelich, Jr., Kenneth P. McDuffie, Atlanta, Ga., Michael P. Malakoff, Pittsburgh, Pa., for plaintiff-appellee.

## 1196

Before HILL, VANCE and ANDERSON, Circuit Judges.

VANCE, Circuit Judge:

We consider whether the first amendment rationale of *Bernard v. Gulf Oil Co.*[1] bars sanctions against a defendant and counsel for secretly soliciting exclusion requests from potential members of a Rule 23(b)(3) plaintiff class.

### I. FACTS

This appeal is the closing phase of a ground-breaking class action against the First National Bank of Atlanta[2] filed by Jackie Kleiner, an Atlanta lawyer and real estate investor. The lawsuit, sounding in fraud, RICO and breach of contract, charged the Bank with reneging on its promise to peg the interest it charged smaller customers to the prime rate by undercutting the announced prime rate for the Bank's best commercial customers.[3] Richard M. Kirby, a partner in the Atlanta law firm of Hansell & Post and an attorney experienced at class action litigation, undertook the Bank's defense.

On April 15, 1983, after over two years of discovery, the district judge certified certain of the contract claims for class action treatment. The tripartite plaintiff class, certified under Fed.R.Civ.P. 23(b)(3), numbered approximately 8,600 potential members.[4]

The following month Kirby served notices of deposition and subpoenas duces tecum on twenty-five prospective class members. Plaintiffs moved for a protective order to bar the Bank from badgering class members by taking their depositions. At a May 20 hearing on the motion, the court initially suggested that the Bank confine class member discovery to affidavits.[5] Outspoken protests from plaintiffs, however, caused the court to reconsider its response. Opposing counsel argued that unilateral contacts by the Bank before the close of the exclusion period would intimidate eligible members, many of whom would be very worried about their credit ratings and their ability to borrow in the future. Counsel contended that many would be deterred from participating in the class, which was their right.

After extended discussion, the district judge granted the protective order subject to a proviso allowing the Bank to take depositions of five class members. Both sides were to have the opportunity to interview the deponents before the depositions, and plaintiffs would have the opening interview. The court took the broader question of unsupervised contacts between the Bank and class members under advisement pending further briefing, ruling:

> At this time, I am going to let [defense counsel] take no more than five depositions. Otherwise, I am granting the motion for a protective order. However, if you can get me some law that convinces me that it is all right for you to otherwise be able to contact class members, then I will permit you to contact additional people informally.

1. 619 F.2d 459 (5th Cir.1980), *aff'd*, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

2. The Bank.

3. Kleiner and George W. Morosani, the second named plaintiff, charged that the Bank overcharged them in two distinct ways. First, the Bank allegedly tied their interest charges to the Bank's announced prime rate rather than to some lower rate charged the Bank's best commercial customers. Plaintiffs further complained that the Bank charged interest on the basis of a 360–day year rather than a 365–day year.

4. Rule 23(b)(3) authorizes certification of class actions in lawsuits where common questions of law or fact predominate and when no superior means of adjudication exists. Under the provisions of rule, potential class members have the option to withdraw from the class before trial on the merits. Fed.R.Civ.P. 23(c)(2)(A).

5. The district judge remarked:
> I am not really disturbed about the prospect of contacts in this case. I guess I am a little bit worried about all of you using up your time sitting at depositions .... why ... wouldn't it do just as well for the Bank to talk to these people, get affidavits if you want to....

Both Kirby and Richard M. Langway, general counsel for the Bank, attended the hearing.

A month later, on June 29, the district judge approved the class notice required under Fed.R.Civ.P. 23(c)(2). The notice, as approved, informed recipients that they would be included in the class unless they took the affirmative step of opting out by returning an exclusion request to the clerk of the district court within a stated time. The class members were also directed to address any inquiries to their choice of plaintiffs' or defense counsel.[6] After further negotiation, August 13 was set as the date of mailing.

The following day, June 30, the district judge entered a sua sponte order amplifying the class notice ruling. According to the addendum, copies of the proposed replies to inquiries, as well as the inquiries themselves, were to be furnished to opposing counsel before being mailed. In addition, the district judge acknowledged the receipt of briefs on the ex parte contact issue and explicitly reiterated that the question of unsupervised Bank contacts with plaintiff class remained under advisement.

By mid-July, the Bank had seized upon the idea of soliciting class exclusion requests as a means to reducing its potential liability and quelling the adverse publicity the lawsuit had spawned.[7] Kirby, alerted of the plan, researched the legality of a solicitation campaign. Meeting with top Bank managers on August 8, Kirby advised that a communications scheme would be lawful under the precepts of *Bernard v. Gulf Oil Co.* as long as the conversations were truthful and noncoercive. The lawyer warned that any such campaign, while legal, would be an extraordinary move likely to provoke the wrath of the court. He outlined the risks the Bank might court, including an injunction against further contacts, cancellation of the exclusion requests, and an order to issue corrective notice at Bank expense.

Without further hesitation, Thomas R. Williams, chairman of the board, canvassed the potential benefits and costs and resolved to proceed.[8] The remainder of the discussion was devoted to specifics. In response to a question, Kirby opined that phone calls would be better than letters, given the danger that people would disregard letters as more "junk mail." Williams assigned Thomas Chapman, Bank marketing director, responsibility for coordinating all solicitation efforts in close consultation with Kirby and Langway.

Secrecy and haste shrouded the undertaking, which would coincide with the district judge's vacation. Neither the court nor opposing counsel were alerted to the telephone campaign, as was Kirby's intent. Chapman hurriedly organized a force of 175 loan officers to staff the telephones, while lawyers Kirby and Langway lent their assistance by reviewing and revising a briefing letter from Williams to the employees as well as a question-and-answer prompting sheet to be used by the loan officers. Kirby supplied Chapman with the class notice and exclusion request forms

---

**6.** The notice provided:

> 10. *Questions To Be Directed to Either Plaintiffs' Counsel or Defendant's Counsel*
>
> Please address all inquiries you may wish to make about this action to either or both of the below listed persons:
>
> (1) Plaintiffs' counsel—Jerome J. Froelich, Jr., Suite 1500, 2 Peachtree Street, Atlanta, Georgia 30383;
>
> (2) Bank's counsel—Richard M. Kirby, Hansell & Post, 3300 First Atlanta Tower, Atlanta, Georgia 30383.

**7.** The initial proposal was crystallized in an August 3 Bank memorandum entitled "Game Plan for Kleiner Suit," which began:

> [H]aving examined the upcoming "solicitation to the affected classes" with the legal area, several communication targets seem important for action.

**8.** Once counsel gave the go-ahead, the Bank saw little or no reason for restraint:

> [T]he Bank perceived that sending a second, corrective notice would be a relatively innocuous remedy under the circumstances. Once loan officers had "put the finger" on their customers, a second notice would probably still yield extra opt-outs. In short, they considered it a "no-lose" situation.
>
> Opinion of the district court at 27.

for reproduction. He also collaborated with the Bank's computer center to generate lists of potential class members broken down under each of the Bank's cost centers.

On August 11, two days before the scheduled date of class notice mailing, the Bank convened a meeting of the loan officers. Kirby and Langway sat in the front row. Board chairman Williams opened the meeting with brief introductory remarks, then turned the session over to Chapman. Chapman announced that the Bank was going to take "bold, decisive action which had no precedent." He informed the assembly that the Bank was commencing a "communications program" to insure that the class members in the Kleiner litigation understood the merits of the dispute and their right to opt out. Chapman went on to say that the officers would be asked to telephone the customers they knew best, and he exhorted them to "do the best selling job they had ever done." The officers were to proceed swiftly since, in Chapman's words, the court might halt the program. The objective, according to Chapman's notes, was to persuade the borrowers to "withdraw from the class."

Chapman repeatedly stressed that the conversations were to proceed on a "factual" plane, without arm-twisting or coercion. The loan officers, however, received "no facts beyond those listed in the Questions and Answers sheet, the letter to employees, and the class action notice.... Chapman himself knew little about the lawsuit except what was contained in the materials distributed at the meeting." Opinion of the district court at 20.

The loan officers dispersed into smaller groups where they were told to call the most receptive customers first and to avoid phoning antagonistic borrowers altogether. They were handed computer lists of customers marked "Friend" and "Foe" as well as score sheets lined with columns for tallying opt-out commitments and the dollar amounts of the corresponding loans. The telephone campaign began immediately afterward.[9] The Bank eventually succeeded in reaching a little over 3000 customers, nearly 2800 of whom decided to exclude themselves. Many decided to do so before they received the court-approved notice. By August 12 the Bank had reaped opt-out commitments from customers representing a sum total of $694,997,218 in past or present loans.

The district judge, just back from a two-week vacation, held a hearing on August 24 at plaintiffs' request. When apprised of the campaign, she immediately cited Kirby for contempt and restricted communication to class members by all parties and their counsel to approved responses to individual inquiries. She further denied the Bank permission to depose borrowers who had agreed to opt out. Hansell & Post was cited for contempt the following week. An evidentiary hearing was calendared for October 5.

At an in-chambers conference on September 15, the district judge stated that the proceedings were "in the nature of a disciplinary proceeding" rather than for civil or criminal contempt. The contempt citations were later vacated. The district judge explained that the charges against counsel were grounded in violations of the orders dated May 20 and June 30 as well as in Model Rules 4.2 and 8.4(d) of the A.B.A. Model Rules of Professional Conduct (1983).[10] The court lodged additional charges against the Bank for violation of

---

**9.** The Bank tolerated no opposition to the communications program. When James Kilpatrick, a member of the Bar who was then a loan officer, objected to the use of pressure tactics to induce customers to opt out, he was told to follow the program or "find ... something else to do." He was forced ultimately to resign when he refused to participate.

**10.** Model Rule 4.2 states:

Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so. Model Rule 8.4 provides in relevant part:

Misconduct

Local Rule 221.2 of the Northern District of Georgia.[11]

Following the October hearing, which lasted three days, the court issued an exhaustive order on November 8 declaring the solicitation scheme illegal. The trial court found that Kirby, Hansell & Post, and Langway had rendered advice in bad faith and had knowingly taken part in the illegal opt-out campaign. The court further found that the Bank had acted in bad faith and that the written briefing documents had contained misleading portrayals of fact. As a sanction, the court imposed a $50,000 fine on Kirby and Hansell & Post payable to the clerk of the court. Kirby, his firm, and the Bank were additionally assessed attorneys' fees and costs incident to class notice and the subsequent disciplinary proceeding, which totalled $58,577. Both Kirby and Langway were disqualified from further representation in the case.[12] As a final measure, the district court ruled that the exclusion requests would be voidable following entry of judgment. The Bank, Langway, Kirby and Hansell & Post immediately petitioned for review.

## II. PRELIMINARY MATTERS: JURISDICTION

Since the date of argument before this court, the underlying litigation proceeded to settlement.[13] Under the terms of the court-approved agreement, all qualifying class members who requested exclusion are entitled to void such requests and participate in the distribution of the settlement on equal footing with the remaining class members. The stipulation awarding attorneys' fees by its terms encompasses the district court's award of fees and costs incident to class notice and the disciplinary proceeding. The parties correctly argue that the settlement has mooted issues of attorneys' fees, costs, and the legality of the voidable exclusion sanction. The issue of the injunction against communication with members of the plaintiff class similarly lapsed into mootness upon conclusion of the litigation. *See Hammond Clock Co. v. Schiff,* 293 U.S. 529, 55 S.Ct. 146, 79 L.Ed. 639 (1934); 13A C. Wright & A. Miller, *Federal Practice and Procedure,* § 3533 at 271 (1975).

We remand to the district court with instructions to vacate as moot those portions of the November 8, 1983 order ordering attorneys' fees, costs, voidable opt-out exclusions, and cessation of defense communications with members of the plaintiff class. *United States v. Munsingwear,* 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950).

---

**11.** Local Rule 221.2 prohibited, in pertinent part:

> 221.23 solicitation by formal parties to class action of requests by class members to opt out in class actions under subparagraph (b)(3) of Rule 23 of the Federal Rules of Civil Procedure; and
> 221.24 communications, from counsel to a party, which may tend to misrepresent the status, purpose and effects of the action, and of actual or potential court orders therein, which may create impressions tending, without cause, to reflect adversely on any party, any counsel, the Court, or the administration of justice.

**12.** Langway was disqualified on the basis of his misleading testimony at the October hearing.

It is professional misconduct for a lawyer to:

> . . . .
> (d) engage in conduct that is prejudicial to the administration of justice.

**13.** The entry of a final judgment settled the potentially thorny question of appellate jurisdiction over the appeals filed shortly after the imposition of sanctions. The district court declined to certify the issues for appeal under 28 U.S.C. § 1292(b) and Fed.R.Civ.P. 54(b). After the final order was entered, Kirby, Langway, and Hansell & Post filed protective appeals, and this court granted their motion to consolidate the later appeals with the identical appeals argued in February 1984. We need not address the general question of the appealability of an order disqualifying counsel in a civil case, *see Koller v. Richardson-Merrell, Inc.,* 737 F.2d 1038 (D.C.Cir.) (interlocutory appeal available), *cert. granted,* — U.S. —, 105 S.Ct. 2980, 83 L.Ed.2d 226 (1984). *But see Gibbs v. Paluk,* 742 F.2d 181 (5th Cir.1984). We simply follow the rule in this circuit that a premature appeal can be reviewed if a subsequent judgment of the district court effectively terminates the litigation. *Jetco Elec. Indus., Inc. v. Gardiner,* 473 F.2d 1228, 1231 (5th Cir.1973); *accord Martin v. Campbell,* 692 F.2d 112, 114 (11th Cir.1982).

■ A different result must obtain with respect to the fines and disqualification imposed upon counsel. The $50,000 fine assessed against Kirby and Hansell & Post was imposed pursuant to the inherent powers of the district court and is not subject to revocation by the parties. The issue of the fine thus remains alive.

We reach the same conclusion with respect to disqualification of counsel. The unique nature of a class action necessitates participation of counsel even after the settlement is approved by the court. Notice of the settlement must be sent to all class members. Individual claims must be filed, negotiated, and paid. Counsel for both sides bear the primary responsibility for administering the settlement, usually a lengthy process. The Bank can still be hampered, then, by its counsel's inability to appear before the court in this case.[14]

### III. DID THE COMMUNICATIONS CAMPAIGN VIOLATE LAW?

■ Petitioners argue that they cannot be held to account because their actions were not in derogation of law. The district court held otherwise, 102 F.R.D. 754 grounding its order for sanctions in violations of the May 20 protective order, the June 30 class notice order, Local Rule 221.-2, and the Model Rules of Professional Conduct. Because we conclude that the defense campaign violated the protective and class notice orders, we do not reach the question of the constitutional validity of Local Rule 221.2.[15]

Kirby acknowledges the existence of the May and June rulings but argues that the orders did not involve and therefore did not ban opt-out solicitations. According to Kirby, the sole effect of the directives was to limit the number of depositions the Bank could take, leaving the Bank free to initiate contacts by other means.

In essence Kirby argues that the mandate of the district court cannot exceed the corners of the motion that requested it. Such a conception runs counter to the Court's preeminent role in managing the notification process, *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1012 n. 8 (5th Cir.1977), and effectively would stymie the court whenever it sought to respond to an unfolding and often unpredictable sequence of events.

This appeal is a case in point. The plaintiffs originally moved for a ban on depositions out of concern for harrassment. The district judge's suggestions recommending the substitution of affidavits and the pitched debate that followed widened the inquiry to the larger issue of intimidation through all forms of unsupervised contacts. Viewed in context, the import of the resulting order was unmistakable. The decision to take the question of informal contacts with class members under advisement acted as an order which barred opt-out solicitations and similar communications until further notice. With a single narrow exception, defense counsel *were not to contact* prospective class members.

■ Kirby's argument necessarily would reduce the devices of briefing and advisement to a nullity. As the district court succinctly noted, "counsel are not permitted to discount the Court's unqualified in-

---

**14.** We note further that the brand of disqualification was not lifted at the close of the proceedings. The disciplinary action and consequent disqualification may expose counsel to further sanctions by the bar and portends adverse effects upon counsel's careers and public image. The effects of disqualification will linger long after the closing of the case. The controversy thus remains live and demands consideration. *Connell v. Shoemaker*, 555 F.2d 483, 486–87 (5th Cir.1977); *United States v. Schrimsher*, 493 F.2d 842, 844 (5th Cir.1974); *see also Sibron v. New York*, 392 U.S. 40, 50–58, 88 S.Ct. 1889, 1896–1900, 20 L.Ed.2d 917 (1968).

**15.** *See supra* note 11 for the text of Local Rule 221.2. Petitioners assert that that provision lacked legal effect because previous decisions of the Northern District of Georgia declared the rule unconstitutional under *Bernard*. *See Nation v. Winn-Dixie*, No. C80–1468A (N.D.Ga. May 12, 1981) (Evans, J.); *Kilgo v. Bowman Transp., Inc.*, 88 F.R.D. 592 (N.D.Ga.1980).

We affirm the district court with respect to its rulings predicated on Model Rules 4.2 and 8.4(d).

structions in light of colloquy which precedes a ruling or in light of the Court's perceived reason for an order." Opinion of the district court at 34. We therefore conclude that the May 20 ruling and the companion June ruling prohibited the Bank's communications campaign. The orders, which were directed to counsel as agents of the Bank, were binding on the Bank in its capacity as principal. *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962); *Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911, 916 (11th Cir.1982).

Similarly, we do not fault the orders for perceived procedural defects under Fed.R. Civ.P. 65(d). Rule 65(d) states that injunctions and restraining orders must set forth the reasons for their issuance and identify, with reasonable detail, the acts to be restrained. The orders at issue, however, are of a different ilk. The lower court correctly characterized the rulings as directives to counsel in their capacity as officers of the court, pursuant to the court's inherent power to manage its cases. *See* Fed.R.Civ.P. 23(d)(2). The more relaxed prerequisites of Rule 23(d)(2) therefore applied, as the district court noted:

> Findings of fact and technical precision are unnecessary for such direction to be valid; rather the direction must only be (a) within the Court's power and (b) specific enough so that counsel may understand what conduct or action is required.

Opinion of the district court at 34. The trial court justifiably found that both criteria were "amply met in the instant case." *Id.*

16. Numerous facts lead to the almost inescapable conclusion that the point of the communications campaign was not, as the Bank would have it, to alleviate consumer confusion, but rather to solicit as many exclusions as possible before the court was alerted to the operation. Specifics include: the running tally of commitments and corresponding dollar values; the exhortation to do the "best selling job ever"; the stated objective to get customers to withdraw from the class; and the haste and secrecy of the campaign.

## IV. AUTHORITY UNDER RULE 23 TO BAN OPT–OUT SOLICITATIONS

Rule 23(b)(3), which affords class relief when common questions of law or fact predominate and the class action mechanism is superior to other means of adjudication, provided the vehicle for the Kleiner litigation. The events of this case draw into question the lower court's authority under the federal rules or statutes to forbid defense contacts with the plaintiff class for the purpose of eliciting exclusion requests.[16] *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99, 101 S.Ct. 2193, 2199, 68 L.Ed.2d 693 (1981).

With the introduction of the 23(b)(3) class action in the 1966 amendments to the Federal Rules, courts acquired the authority to consolidate similar claims in order to avoid repeated trials of identical proof even though the cases could fairly be litigated on an individual basis. The resulting economy of effort and uniformity of result was achieved,[17] however, only at the cost of binding individual class members through the res judicata effects of litigation over which they lacked control. Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rule of Civil Procedure (I)*, 81 Harv.L.Rev. 356, 390, 392 (1967).

The dualistic design of the 23(b)(3) class action underscores the tension between individual autonomy and the search for consistency and truth. Its promulgation is proof of the preference for class adjudication of cumulative claims, yet the device is unique among Rule 23 class actions in giving eligible members the right of exclusion from the class.[18] Fed.R.Civ.P. 23(c)(2)(A).

17. The stare decisis effect of the initial judgments may frustrate later claimants' efforts to litigate. In addition, the expense of litigation frequently deters claimants from asserting individual claims. Litigants further benefit from the increased bargaining power afforded a class action.

18. The exclusion mechanism was consciously designed to tilt the balance of inertia in favor of class participation. In the words of one of the drafters of the provision:

> [R]equiring the individuals affirmatively to request inclusion in the lawsuit would result

Alternatively, individual class members are entitled to intervene as of right. To effectuate these safeguards, the court must "direct to the members of the class the best notice practicable under the circumstances," informing them of the opportunity to exclude themselves or to participate in the judgment, whether favorable or not. Rule 23(c)(2).

When confronted with claims pressed by a plaintiff class, it is obviously in defendants' interest to diminish the size of the class and thus the range of potential liability by soliciting exclusion requests.[19] *See* Comment, *Restrictions on Communication By Class Action Parties and Attorneys,* 1980 Duke L.J. 360, 363. Such conduct reduces the effectiveness of the 23(b)(3) class action for no reason except to undermine the purposes of the rule. *See In re General Motors Corporation Engine Interchange Litigation,* 594 F.2d 1106, 1140 n. 60 (7th Cir.1979).

A unilateral communications scheme, moreover, is rife with potential for coercion. "[I]f the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive."

Note, *Developments in the Law—Class Actions,* 89 Harv.L.Rev. 1318, 1600 (1976). *See also* H. Newberg, *Newberg on Class Actions,* current supp. § 2690f (Feb.1984); Comment, 1980 Duke L.J. at 363. This litigation is illustrative. The class consisted of Bank borrowers, many of whom were dependent on the Bank for future financing. Bank customers affected by the litigation included "those who anticipated seeking a note 'rollover,' new loans, extension of lines of credit, or any type of discretionary financial indulgence from their loan officers, and who did not have convenient access to other credit sources." Opinion of the district court at 25–26. As the district court pointed out, the high number of exclusion requests was witness to the inherent coercion of the Bank's machinations.

In view of the tension between the preference for class adjudication and the individual autonomy afforded by exclusion, it is critical that the class receive accurate and impartial information regarding the status, purposes and effects of the class action.[20] This is especially important since the court must not consider the probable outcome of the case in passing on class certification. *Eisen v. Carlisle & Jacque-*

---

in freezing out the claims of people—especially small claims held by small people—who for one reason or another, ignorance, timidity, unfamiliarity with business or legal matters, will simply not take the affirmative step. The moral justification for treating such people as null quantities is questionable.

Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I),* 81 Harv.L.Rev. 356, 397–98 (1967).

19. Similarly, it is hardly surprising that the defense bar continues to advocate the substitution of an opt-in procedure. One commentator has observed:

[T]he opt-in procedure is ... a very effective means of diminishing the size of a class, because an affirmative act by an individual is always less likely than mere inaction and hence presents certain dangers. Requiring class members to insert themselves into the suit will result inevitably in smaller classes, unrelated to the magnitude of the harm done or the merits of the case. In addition to its unfairness, unnecessary reduction of class size negates the perceived benefits of class actions as efficient and economic means of litigation, since those who fail to opt in could

bring their own suits, thereby multiplying cases where one would do.

Note, *Reforming Federal Class Action Procedure: An Analysis of the Justice Department Proposal,* 16 Harv.J.Legis. 543, 571–72 (1979) (footnotes omitted).

20. In response to the Bank's fear that recipients would discard the notice as "junk mail," the district court remarked:

The Court recognizes that the telephone campaign may have served one legitimate interest which is shared by the Court: minimizing participation by default. However, other methods are available which do not infringe on the free choice of prospective class members. One is using a bold-type notice on the envelope in which the class notice is mailed, identifying it as a legal notice, such as was done here. Another possibility would be telephonic contacts by a disinterested third party, acceptable to both plaintiff and defendant, who would determine whether the notice had been received.

Opinion of the district court at 25 (footnote omitted).

*lin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The "best practicable notice" envisioned by the Rule is notice that conveys objective, neutral information about the nature of the claim and the consequence of proceeding as a class. *In re Nissan Motor Corporation Antitrust Litigation,* 552 F.2d 1088, 1104–05 (5th Cir. 1977).

Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable. *See Zarate v. Younglove,* 86 F.R.D. 80, 90 n. 13 (C.D.Cal.1980). Concomitantly, a solicitations scheme relegates the essential supervision of the court to the status of an "afterthought." *See* Opinion of the district court at 36. In this case, the carefully constructed edifice of check and countercheck, notice and reply, was obliterated when the telephones were lifted from their cradles. The Bank's actions obstructed the district court in the discharge of its duty to "protect both the absent class and the integrity of the judicial process by monitoring the actions before it." *Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 331, 100 S.Ct. 1166, 1170, 63 L.Ed.2d 427 (1980); *see In re Air Crash*

*Disaster,* 549 F.2d at 1012 n. 8; 2 H. Newberg, *supra,* at 1189. The Bank's subterfuge and subversion constituted an intolerable affront to the authority of the district court to police class member contacts. Accordingly, we hold that the trial court had ample discretion under Rules 23(b)(3) and 23(d)[21] to prohibit the Bank's overtures.

## V. FIRST AMENDMENT IMPLICATIONS

The essence of petitioners' claim is a first amendment challenge to the disciplinary action of the trial court. They attack the May 20 and June 30 orders as an unconstitutional prior restraint, arguing that the rulings were neither specific nor "narrowly tailored to address an immediate, compelling danger" in conformance with *Bernard v. Gulf Oil Co.,* 619 F.2d 459 (5th Cir.1980) (en banc), *aff'd,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

"[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502, 69 S.Ct. 684, 690, 93 L.Ed. 834 (1949). Petitioners' speech was expression of a commercial variety,[22] which until

---

**21.** Rule 23(d)(2) authorizes the court of record to enter orders "requiring, for the protection of the members of the class ..., that notice be given in such manner as the court may direct to some or all of the members of any step in the action ...."

**22.** The Bank's entreaties indubitably amounted to speech of a commercial bent. Commercial speech consists of expression related largely or solely to the economic interests of the speaker and the audience. *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976). Commercial speech encompasses not merely direct invitations to trade, but also communications designed to advance business interests, exclusive of beliefs and ideas. *See In re Primus,* 436 U.S. 412, 438 n. 32, 98 S.Ct. 1893, 1908 n. 32, 56 L.Ed.2d 417 (1978). *See also, e.g., Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, ——,

103 S.Ct. 2875, 2880–81, 77 L.Ed.2d 469 (1983) (manufacturer's informational pamphlets discussing the advisability of prophylactics constitute commercial speech); *Friedman v. Rogers,* 440 U.S. 1, 11–12, 99 S.Ct. 887, 895, 59 L.Ed.2d 100 (1979) (trade name constitutes commercial speech).

Clearly, the thrust of the Bank's campaign was to defend its business dealings; its motivation, to shore up Bank earnings. As the court below observed:

[The purpose of the program] was to further what the Bank perceived as its own financial interests. The interests of its customers had nothing to do with it.

Opinion of the district court at 24. The Bank does not assert, as it cannot, that the campaign implicated rights of political expression, free association, or mutual assistance in asserting legal rights. *See Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 458–59, 98 S.Ct. 1912, 1919–20, 56 L.Ed.2d 444 (1978). Nor was the underlying message protected as pure speech. *Bolger,* 463 U.S. at —— n. 14, 103 S.Ct. at 2880 n. 14.

recently fell outside the ambit of the first amendment. In *Virginia State Board of Pharmacy v. Virginia Citizens Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the Supreme Court announced that commercial speech would henceforth receive limited first amendment protection consonant with its role in assuring the proper allocation of resources and the formation of informed decisions. *Id.* at 762, 765, 96 S.Ct. at 1827. Subsequent Supreme Court cases have delimited the contours of the right accorded commercial speech.

■■■■ As a threshold matter, untruthful or misleading speech has no claim on first amendment immunity. *Central Hudson Gas Co. v. Public Service Commission,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980); *Virginia Pharmacy Board,* 425 U.S. at 771, 96 S.Ct. at 1830. Commercial speech merits constitutional safeguards only to the extent it is accurate, in keeping with its purpose of insuring the free flow of reliable information crucial to independent decisionmaking. No constitutional objection thus inheres in banning "forms of [commercial] communications more likely to deceive the public than to inform it...." *Central Hudson,* 447 U.S. at 563, 100 S.Ct. at 2350 (citations omitted). Commercial speech that *is* protected is legitimately subject to stricter governmental regulations than that allowed for noncommercial expression, *see Virginia Pharmacy Board,* 425 U.S. at 771–72 & n. 24, 96 S.Ct. at 1830–31 n. 24; *United States Postal Service v. Athena Products, Ltd.,* 654 F.2d 362, 367 (5th Cir. Unit B 1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982), consistent with the "subordinate position in the scale of First Amendment values" assigned to commercial speech. *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978).

In the brief life of the commercial speech doctrine, the Supreme Court has repeatedly warned that traditional prior restraint safeguards do not necessarily extend to questions of commercial speech. *See Central Hudson,* 447 U.S. at 564 n. 6, 571 n. 13, 100 S.Ct. at 2350 n. 6, 2354 n. 13; *Friedman v. Rogers,* 440 U.S. 1, 10 & n. 9, 99 S.Ct. 887, 894 n. 9, 59 L.Ed.2d 100 (1979); *Virginia Pharmacy Board,* 425 U.S. at 771–72 n. 24, 96 S.Ct. at 1830–31 n. 24. Commercial speech is marked by a resilience not found in political commentary or discourse in ideas. *Virginia Pharmacy Board,* 425 U.S. at 771 n. 24, 96 S.Ct. at 1830 n. 24. Unlike news reportage commercial speech is amenable to advance verification because the speaker ordinarily "seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else." *Id.* For these reasons, commercial speech seldom implicates the traditional concerns underlying the prior restraint doctrine.

In an uncompromising stance, petitioners ignore the generic distinctions between pure and commercial speech and argue that the prior restraint strictures announced in the en banc decision in *Bernard*[23] must apply with equal force to their case. An assessment of their claim requires a reexamination of *Bernard* in light of the doctrine governing commercial speech.

*Bernard* was spawned from a set of successive race discrimination claims lodged by black employees of the Port Arthur, Texas Gulf Oil plant. An initial EEOC proceeding had culminated in a conciliation agreement providing for back pay. Dissatisfied with the resolution reached by the EEOC, plaintiffs, represented by local counsel in affiliation with the NAACP Legal Defense and Education Fund, filed a class action against Gulf alleging race discrimination.

---

Taken together, the defense of the Bank's business conduct, the underlying profit motive, and the invitation to opt out branded the telephone

canvass as speech of a commercial nature. *Id.,* 463 U.S. at ——, 103 S.Ct. at 2880–81.

**23.** 619 F.2d 459 (5th Cir.1980) (en banc).

Before the date of class certification, Gulf requested an order limiting communications by plaintiffs and their counsel with actual or potential class members. The company attested that counsel for plaintiffs had advised potential class members that they stood to double their recovery by refusing to sign releases in favor of Gulf under the conciliation agreement. Without first corroborating Gulf's unsworn allegations or specifying findings of fact, the trial court entered an order barring parties and counsel from contacting the plaintiff class without advance approval. The disputed order was patterned after a model order contained in the *Manual for Complex Litigation*, pt. II, § 1.41 (1973 ed.). 619 F.2d at 463–64.

On review, a panel of the former fifth circuit affirmed the district court. 596 F.2d 1249 (5th Cir.1979). The court en banc vacated the panel opinion, 604 F.2d 449 (5th Cir.1979), and reversed the district court on first amendment grounds. Holding that the attempted solicitations constituted protected, non-commercial political expression [24] which called "into play the full panoply of First Amendment safeguards against prior restraint," 619 F.2d at 473, the en banc court refused effect to the order as an unconstitutional prior restraint. The disputed order was constitutionally deficient because the suppressed expression posed no certain threat of direct, immediate and irreparable harm; because the order was not narrowly drawn and limited to the least restrictive means of regulation; and because it lacked predicate findings of particular abuses. *Id.* at 473–77.

On review, the Supreme Court affirmed the en banc court. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). Resolving the case on statutory grounds to avoid the first amendment question, the court concluded that the contested order thwarted the named plaintiff's ability to form a class and prosecute the class action, in violation of Rule 23. *Id.* at 101–04. The Court held that under Rule 23, orders barring plaintiff contacts with members of the plaintiff class "should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101.

*Bernard* was a classic case of noncommercial speech which directly implicated the doctrine of prior restraint. In the domain of commercial speech, as discussed, the Supreme Court had issued repeated admonitions against the wholesale incorporation of the law of prior restraint.[25] *Athena Products*, 654 F.2d at 367. We therefore judge petitioners' prior restraint argument under a relaxed standard of scrutiny better suited to the hardiness of commercial speech. *Cf. In re San Juan Star Co.*, 662 F.2d 108, 116 (1st Cir.1981) (relaxed standard for review of order prohibiting dissemination to press of communications produced during discovery).

■ In general, an order limiting communications regarding ongoing litigation between a class and class opponents will satisfy first amendment concerns if it is grounded in good cause and issued with a "heightened sensitivity" for first amendment concerns, *cf. id.* at 116. In ascertain-

**24.** The *Bernard* case qualified as protected political expression under *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), and *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), because counsel for plaintiffs had no direct financial stake in the case and because the case was a vehicle for expressing the political beliefs of the NAACP. 619 F.2d at 472–73.

**25.** In *Bernard* the Supreme Court similarly took pains to not to rule out all restraints under Rule 23:

    In the conduct of a case, a court often finds it necessary to restrict the free expression of

participants, including counsel, witnesses, and jurors. Our decision regarding the need for careful analysis of the particular circumstances is limited to the situation before us—involving a broad restraint on communication with class members. We also note that the rules of ethics properly impose restraints on some forms of expression. *See, e.g.,* ABA Code of Professional Responsibility, DR 7–104 (1980).

*Bernard*, 452 U.S. at 104 n. 21, 101 S.Ct. at 2201–2202 n. 21.

ing the existence of good cause, four criteria are determinative: the severity and the likelihood of the perceived harm; the precision with which the order is drawn; the availability of a less onerous alternative; and the duration of the order. *Id.; Athena Products,* 654 F.2d at 367–68.

■ Consistent with the Supreme Court's clear concern with ensuring the effective regulation of advertising and other forms of solicitation, *Athena Products,* 654 F.2d at 367, it is unnecessary for a trial court to issue particularized findings of abusive conduct when a given form of speech is inherently conducive to overreaching and duress. The Supreme Court has acknowledged that unsupervised oral solicitations, by their very nature, are wont to produce distorted statements on the one hand and the coercion of susceptible individuals on the other:

> [I]n-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking; there is no opportunity for intervention or counter-education. . . .

*Ohralik,* 436 U.S. at 457, 98 S.Ct. 1919 (footnote omitted). *See also id.* at 458, 460–62, 98 S.Ct. at 1919, 1920–21. Under such circumstances, "the absence of explic-it proof or findings of harm or injury is immaterial," *id.* at 468, 98 S.Ct. at 1924, and the trial court is empowered to enter prophylactic orders designed to prevent harm before it happens.[26] *Id.* at 464–68, 98 S.Ct. at 1922–24. The Bank's telephone solicitation canvass is a classic example of a major potential abuse which necessitates restraint.[27] *See Bernard,* 619 F.2d at 476.

■ In the realm of litigation, a fair and just result often presupposes restraints on the speech of the parties. *Seattle Times Co. v. Rhinehart,* —— U.S. ——, 104 S.Ct. 2199, 2207 n. 18, 81 L.Ed.2d 17 (1984). Inroads on the principle forbidding the solicitation of exclusion requests in 23(b)(3) class actions could spell the ultimate extinction of that form of relief. Given the inherent coercion conveyed by the Bank's covert campaign, we agree that the district court possessed the authority to regulate such contacts without the predicate record and findings required in *Bernard.*

The trial court's order was narrowly drawn to avoid suppressing utterances worthy of first amendment protection. As a directive addressed to counsel for the Bank, the ambit of the order was restricted to communications regarding the litigation. The order thus did not impinge on the Bank's ability to speak with customers about routine business matters unrelated to the lawsuit. Since defense counsel had

---

**26.** While the *Ohralik* analysis involved a subsequent as opposed to a prior restraint, the decision's approval of prophylactic rules comports with the policy encouraging the effective oversight of commercial speech.

**27.** This case illustrates precisely the same dangers discussed in *Ohralik.* The telephone campaign left the court and counsel powerless to corroborate the supposedly innocent content of the conversations. The Bank's claims of innocence are suspect, moreover, because the briefing materials used to answer customer questions insinuated reprisals or distortions of fact, as the court justifiably found. "[B]oth the Bank's top management and its counsel knew that by verbally providing information to customers through Defendant's employees there was a high likelihood that the facts would become even further skewed in transmission.

This likelihood was further heightened by the Bank's election to use a non-lawyer, who had little familiarity with the case, but good persuasive skills, to make the primary presentation to those who would be contacting absent class members." Opinion of the district court at 27. Worse yet, the loan officers who made the telephone calls were the ones who controlled the customer's line of credit, and their on-the-spot entreaties pressured the listener to reach an immediate decision to comply before hearing the opposite point of view. The "usual cure for false speech is more speech," but in this case the Bank left "no time for more speech before the party opted out." *Zarate v. Younglove,* 86 F.R.D. 80, 90 n. 13 (C.D.Cal.1980). It comes as no surprise that over seventy-five percent of those contacted decided to opt out.

an ethical duty[28] to refrain from discussing the litigation with members of the class as of the date of class certification, if not sooner, the order in no way tread on legitimate communications by counsel.

Similarly, we discern no less restrictive alternative to the district judge's order. The purpose of the directive was to filter news of the opportunity for exclusion through the impartial and open medium of court-supervised notice. As such, the order implemented the preview screening which the Supreme Court has commended as a constitutional substitute for a complete ban on communications.[29] *Central Hudson*, 447 U.S. at 571 n. 13, 100 S.Ct. at 2354 n. 13.

■ With respect to commercial and noncommercial speech alike, "the first amendment protects against erroneously imposed prior restraints of excessive duration." *Athena Products*, 654 F.2d at 367. The lower court's order, by its very nature, limited defense contacts only up through the time of trial. *See In re San Juan Star*, 662 F.2d at 117. The ban on exclusion solicitations, from a practical standpoint, was of even briefer duration, extending only through the end of the exclusion period. The limited duration of the order thus satisfied the requirements of the first amendment.

"When dealing with restrictions on commercial speech we frame our decisions narrowly, 'allowing modes of regulation [of commercial speech] that might be impermissible in the realm of noncommercial expression.'" *Friedman*, 440 U.S. at 11 n. 9, 99 S.Ct. at 894 n. 9 (quoting *Ohralik*, 436 U.S. at 456, 98 S.Ct. at 1918). The scope and the breadth of the principle against prior restraint in the realm of commercial speech has yet to be charted. In deciding that the order of the court withstands scrutiny under the first amendment, we do not necessarily intimate that the law of prior restraint finds no sanctuary in matters of commercial speech. We do, however, conclude that the narrow scope of the order at hand, the unprotected nature of petitioners' speech, and the gravity of the harm it threatened dictate affirmance in this case.

## VI. SANCTIONS FOR ADVICE GIVEN BY COUNSEL

The district court twice over issued orders directing counsel for the Bank to refrain from contacting the plaintiff class. Kirby knew of the orders, as the trial court found.[30] Nevertheless he counselled the Bank to disregard them. The question on review is whether Kirby and his firm, as counsel for the Bank, properly face discipline as a consequence of their advice.

According to appellants, sanctions must not issue because their advice, however mistaken, was given in good faith. Observing that a lawyer may counsel or assist a client's good faith efforts to test the validity of a law in good conscience, they main-

---

**28.** The duty arises from Rule 4.2 of the ABA Model Rules of Professional Conduct (1983) (former version at Disciplinary Rule 7–104), which provides:

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so.

At a minimum, class counsel represents all class members as soon as a class is certified, *Van Gemert v. Boeing Co.*, 590 F.2d 433, 440 n. 15 (2d Cir.1978), *aff'd*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); if not sooner, *see Roper v. Consurve, Inc.*, 578 F.2d 1106, 1110 (5th Cir. 1978), *aff'd sub nom. Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980).

The court below correctly concluded that the solicitation of exclusions constitutes a "per se" abuse. Under such circumstances, the court was justified in denying the Bank discovery of class members for purposes of rebutting the charges of coercion.

**29.** Alternatively, the order was a lawful restriction on the time, place and manner of communication. *Bates v. State Bar of Arizona*, 433 U.S. 350, 384, 97 S.Ct. 2691, 2709, 53 L.Ed.2d 810 (1977).

**30.** We review the district court's findings of fact in a counsel disqualification case under the clearly erroneous rule. *Woods v. Covington County Bank*, 537 F.2d 804, 810 (5th Cir.1976).

tain that a lawyer who counsels disobedience to a standing order of the court stands firmly within ethical bounds.

■ The inevitable result of this position would be to cripple orderly processes of trial and appeal on which enforcement of the laws depends. As a fundamental proposition, orders of the court *"must be obeyed* until reversed by orderly review or disrobed of authority by delay or frustration in the appellate process...." *United States v. Dickinson,* 465 F.2d 496, 509 (5th Cir.1972) (emphasis in original), *cert. denied,* 414 U.S. 979, 94 S.Ct. 270, 38 L.Ed.2d 223 (1973); *see GTE Sylvania, Inc. v. Consumers Union,* 445 U.S. 375, 386–87, 100 S.Ct. 1194, 1201–02, 63 L.Ed.2d 467 (1980); *Maness v. Myers,* 419 U.S. 449, 458, 95 S.Ct. 584, 590, 42 L.Ed.2d 574 (1975). Parties and counsel alike are bound by this admonition. *Maness,* 419 U.S. at 459, 95 S.Ct. at 591. If the order appears to be incorrect, the proper course of action lies in review:

> If the order is believed to be incorrect, the remedy generally is to seek a change in the order—usually by a motion to quash—and, if this is denied, then to appeal and, absent a stay, promptly to comply with the order.

*In re Grand Jury Proceedings,* 601 F.2d 162, 168–69 (5th Cir.1979) (citation omitted).

■ Disobedience of a court order unequivocally merits punishment save in instances in which compliance would necessarily result in " 'an *irrevocable* and permanent surrender of a constitutional right.' " *Id.* at 169 (quoting *Dickinson,* 465 F.2d at 512); *Maness,* 419 U.S. at 460, 95 S.Ct. at 592. In *Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), the Supreme Court "emphatically rejected the suggestion that an individual may disregard a court order simply because [it] interfered with ... his exercise of First Amendment rights." *Dickinson,* 465 F.2d at 509. Obviously, commercial speech commands no greater claim to immunity.

■ It is essential that lawyers have the liberty to advise their clients of the legal consequences of proposed courses of action free of a Damoclean sword. *Maness,* 419 U.S. 467, 95 S.Ct. at 595; *In re Watts,* 190 U.S. 1, 29, 23 S.Ct. 718, 725, 47 L.Ed.2d 933 (1903). Otherwise, lawyers would shelve their "zeal for forthrightness and independence," *Maness,* 419 U.S. at 466, 95 S.Ct. at 595, which secures informed compliance with the law.

■ This case, however, is of an entirely different order. When a court issues a ruling, a lawyer must advise his client to comply and must not counsel disobedience. *Id.* at 459, 95 S.Ct. at 591. The opposite result, if sanctioned, could only result in the unravelling of the rule of law. There are few mandates so plain as the command to obey the order of the court.[31] Nevertheless, petitioners gave comfort and counsel to disobedience, in lieu of review. Under such circumstances, we conclude that the imposition of sanctions was an appropriate act by the district court in defense of its authority.

To compound matters, Kirby advised the Bank to use the telephone in lieu of letters because it would be more effective. "There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity." Model Rules of Professional Conduct Rule 1.2(d) comment (1983). Kirby's review of written documents and collation of class lists only deepened his entanglement in illegality. "By actively assisting the Bank in preparing the information to be given to prospective class members, some of which was

---

**31.** ABA Model Rule 3.4(c), furthermore, provides that a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal except for an *open* refusal based on an assertion that no valid obligation exists ...." (emphasis added).

Because the issue of advice turned on compliance with court orders rather than with first amendment immunity, the district court properly rejected an offer of testimony by C.B. Rogers as irrelevant.

legal in nature, and organizing the contact system, Kirby did effectively communicate with persons represented by counsel," Opinion of the district court at 30—in direct disregard of court orders to the contrary.

This court, if necessary, will lend the bar unwavering support in the zealous commission of its duties, but "it will not equate contempt with courage ...." *Sacher v. United States*, 343 U.S. 1, 13–14, 72 S.Ct. 451, 457, 96 L.Ed. 717 (1952).

## VII. THE NATURE OF THE DISCIPLINARY PROCEEDING AND THE SEVERITY OF SANCTIONS

The vacated citations for contempt and the imposition of a substantial fine payable to the clerk of the district court raise the question of the procedural adequacy of the October 5 proceedings. Petitioners attempt to give the disciplinary proceedings a criminal cast in order to invalidate them for lack of criminal procedural safeguards. The punitive character of the $50,000 fine, in their view, fixes the proceeding as one of criminal contempt, requiring the right to jury trial and analogous criminal procedural rights.

This position was voiced long ago in *Gamble v. Pope & Talbot, Inc.*, 307 F.2d 729 (3d Cir.) (en banc), *cert. denied*, 371 U.S. 888, 83 S.Ct. 187, 9 L.Ed.2d 123 (1962), and it is one that has met consistent rejection in this circuit. Courts possess the inherent power to protect the orderly administration of justice and to preserve the dignity of the tribunal. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–65, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980). "The inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." *Flaksa v. Little River Construction Co.*, 389 F.2d 885, 888 (5th Cir. 1968); *see Miranda v. Southern Pacific Transportation Co.*, 710 F.2d 516 (9th Cir. 1983); Note, *Civil Procedure—Power of*

Federal Courts to Discipline Attorneys for Delay in Pre-trial Procedure, 38 Notre Dame L. 158, 161–66 (1963). A trial judge possesses the inherent power to discipline counsel for misconduct, short of behavior giving rise to disbarment or criminal censure, without resort to the powers of civil or criminal contempt.[32] *Flaksa*, 389 F.2d at 888 n. 10. The court's power to impose appropriate sanctions on attorneys practicing before it "springs from a different source than does the power to punish for criminal contempt." *Pope & Talbot, Inc.*, 307 F.2d at 735–36 (Biggs, C.J., dissenting); *See also Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 512, 22 L.Ed. 205 (1873) (discussing the source and scope of a court's power to cite for contempt or disbar attorneys).

The authority of a court over officers of its bar is at least as great as its power over litigants. *Roadway Express*, 447 U.S. at 766, 100 S.Ct. at 2464 (citing *Flaksa*). Since misconduct by a party courts the risk of outright dismissal, lesser sanctions undoubtedly attend the court's inherent power to discipline intentional attorney misconduct of the sort involved in this case. *See id.* Such sanctions include assessment of attorneys' fees and costs, *id.;* disqualification of counsel, *Flaksa*, 389 F.2d at 887; and monetary penalties payable to the clerk of the court, *Burden v. Yates*, 644 F.2d 503, 505 (5th Cir. Unit B 1981); *Woodham v. American Cystoscope Co.*, 335 F.2d 551, 557 & n. 15 (5th Cir. 1964).

The case thus devolves into a question of the severity of the sanctions as opposed to their propriety. "[T]he most severe in the spectrum of sanctions [dismissal] ... must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deter-

**32.** Contrary to petitioners' assertion, Local Rule 71.54 of the northern district of Georgia does not specify the power of contempt as the sole remedy for attorney violations of the rules of ethics.

rent." *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976) (per curiam). Since dismissal is available for purposes of deterrence, stiff monetary penalties would certainly be appropriate, at least as long as they did not equal or exceed the damages which would be awarded in dismissal. *See* Comment, *The Emerging Deterrence Orientation in the Imposition of Discovery Sanctions*, 91 Harv.L.Rev. 1033, 1048 & n. 90 (1978); Renfrew, *Discovery Sanctions: A Judicial Perspective*, 67 Calif.L.Rev. 264, 278 (1979). In view of counsel's arrogance and the millions of dollars that hung in the balance, the size of the fine assessed by the court was entirely commensurate with the willfulness and gravity of counsel's misconduct. "Unless severe sanctions are imposed ... the deterrent function of sanctions will not be achieved." Renfrew, *supra*, at 643.

Petitioners also object to lead trial counsel Kirby's disqualification from continued representation in the case.[33] In *Woods v. Covington County Bank*, 537 F.2d 804 (5th Cir.1976), this circuit formulated a two-part test for disqualification of counsel:

First, although there need not be proof of actual wrongdoing, "there must be at least a reasonable possibility that some specifically identifiable impropriety did occur." Second, "a court must also find that the likelihood of public suspicion or obloquy outweighs the social interest which will be served by a lawyer's continued participation in a particular case."

*United States v. Hobson*, 672 F.2d 825, 828 (11th Cir.1982) (quoting *Woods*, 537 F.2d at 813 & n. 12), *cert. denied*, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982). Once the preceding requirements are satisfied, a court can order disqualification based solely on past improprieties without regard for future taint affecting the outcome of the proceeding.[34] *Compare Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979).

The uncontroverted proof of Kirby's wrongdoing satisfies the first requirement under *Hobson*. Turning to the second test, we must weigh the degree to which Kirby's retention would have eroded public trust in the judiciary against the Bank's interest in retaining counsel of choice. The Bank undoubtedly had good reason for wanting to retain, on the eve of trial, the attorney who had prepared its case. The effects of Kirby's removal were mitigated, however, by the trial court's decision to preserve continuity of representation by allowing Hansell & Post to defend the Bank in Kirby's stead. Juxtaposed against the Bank's concern is a strong competing interest in securing the obedience to mandates of the court which is necessary to secure the orderly administration of the laws. *See United States v. Dinitz*, 538 F.2d 1214, 1219 & n. 6 (5th Cir.1976) (en banc), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977). Finally, and importantly, the Bank was not an innocent victim of disqualification. The covert communications scheme was of its own devise and execution. We therefore hold that the concern for public trust in the impartial enforcement of the laws overrode the Bank's entitlement to counsel of choice.

## VIII. DISQUALIFICATION OF GENERAL COUNSEL LANGWAY

Langway met with disqualification for lying on the stand while testifying at the October disciplinary proceeding. At the hearing, Jerome Froelich, counsel for plaintiffs, asked Langway to admit stating that

---

**33.** On review, the clearly erroneous test applies to findings of fact while the application of ethical standards requires independent review. *United States v. Hobson*, 672 F.2d 825, 827–28 (11th Cir.) *cert. denied*, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982); *Cossette v. Country Style Donuts, Inc.*, 647 F.2d 526, 530 (5th Cir. 1981).

**34.** In disputing this test, the petitioners fail to distinguish between disbarment and the less serious sanction of disqualification from a particular case. The standards are more relaxed for the latter.

he had not consulted the court about the solicitation campaign because "the court would have stopped us and we wouldn't have been able to make new law." Langway replied, "No, I never said that, Jerry, absolutely did not say that." The judge discredited Langway's testimony and ordered that he be struck as counsel of record in the case based on his denial.

The issue on review is a narrow one. The trial court disqualified Langway without notice of the charge against him or an opportunity to explain. Langway was not included in the court's show cause orders. The first indication that the trial court faulted Langway's truthfulness or contemplated sanctions against him appeared in the November 8 ruling which summarily ordered his disqualification. Since the decision to disqualify was neither immediate nor necessary "to preserve order in the court," *Norton v. Tallahassee Memorial Hospital*, 700 F.2d 617, 619 (11th Cir.1983), due process required an opportunity to be heard. *Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 512–13, 22 L.Ed. 205 (1873). *See also In re Ruffalo*, 390 U.S. 544, 550–52, 88 S.Ct. 1222, 1225–26, 20 L.Ed.2d 117, *modified*, 392 U.S. 919, 88 S.Ct. 2257, 20 L.Ed.2d 1380 (1968). We intimate no disapproval of the district court's views on Langway's credibility or on the propriety of the sanction. We only hold that any sanctions must be imposed in accordance with the due process of law. We reverse the district court with respect to the general counsel's case and remand for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, VACATED AS MOOT IN PART, REVERSED IN PART AND REMANDED WITH INSTRUCTIONS.

JAMES C. HILL, Circuit Judge, concurring in part and dissenting in part:

I concur in both the result and rationale of Part II of the majority's opinion, vacating moot claims, and Part VIII of the majority's opinion, reversing the ruling on disqualification of attorney Richard M. Langway. I dissent from the majority's affirmance of sanctions against attorney Richard M. Kirby and the law firm of Hansell & Post. I do so not because I approve counsel's actions in this case—emphatically, I do not—but because the sanctions here at issue were imposed for the violation of direction by the district court which I believe was unclear. Because I am unwilling in principle to place upon an attorney by hindsight a duty to divine at his peril the import of an unclear directive from the court, I reach a result contrary to the majority on the issue of sanctions.

The cornerstone of Judge Vance's thoughtful resolution of the sanction issue is that "[t]he decision to take the question of informal contacts with class members under advisement acted as an order which barred opt-out solicitations and similar communications until further notice." Majority opinion at 12. I cannot agree with this determination. When a court tells a lawyer that his argument is under advisement that lawyer should, in fairness to the judge, refrain from further action on the contested point or, alternatively, seek clarification from the court. This lawyer acted otherwise and in doing so skated on the thinnest of ice. The issue before us is simply whether the ice broke. The majority concludes it did, and I, that it did not.

The power of judicial sanction is great. The consequence of its exercise may be severe. This is properly so because of the magnitude of the interest served, the orderly administration of justice—the rule of law itself. But a concomitant of that power is a great caution and an abiding concern that the rule upon which the law is to operate be clearly articulated. As the majority notes, this is particularly so with respect to lawyers because upon a lawyer's understanding depend the rights of many, and the trial lawyer is an advocate.

The rule articulated by Judge Evans in this case, and putatively violated by Kirby was, regrettably and through no fault of

Judge Evans,[1] unclear. Solely on that basis, I disapprove the affirmance of sanctions in this case.

*Ratio decidendi* aside, a further observation is warranted. In *Bernard v. Gulf Oil Co.*, 619 F.2d 459 (5th Cir.1980) (en banc), our predecessor court reversed the district court order prohibiting a class-action litigant's contact with class members. Two grounds for that result were articulated. The narrower ground, not at issue here, was that the order was inappropriate under Rule 23(d) of the Federal Rules of Civil Procedure. *Bernard,* 619 F.2d at 478. However, the en banc court also found the subject order implicated first amendment freedoms of expression and invalidated it as an unconstitutional prior restraint. *Bernard,* 619 F.2d at 477. Reviewing that decision, the Supreme Court affirmed on the Rule 23(d) ground, but was silent on the constitutional holding of the case. *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 103–104, 101 S.Ct. 2193, 2201, 68 L.Ed.2d 693 (1981). The constitutional holding of *Bernard,* whatever that holding may be, is thus binding authority in this circuit today. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

As I read *Bernard,* it holds that an order barring communication between class-action litigants and other members of the class violates the first amendment. I apprehend that attorney Richard Kirby, perhaps with some surprise, also read *Bernard* in this way. As I said in *Bernard,* I believe it unwise to subject orders issued by a trial judge in connection with an ongoing law suit to first amendment scrutiny. *Bernard,* 619 F.2d at 481 (Hill, J., dissenting). For that reason, I believe Judge Vance's narrower interpretation of *Bernard,* incorporated in the majority's opinion here, states better law. Nevertheless, I am reluctant to uphold sanctions against a lawyer, reading *Bernard* without benefit of Judge Vance's opinion, for interpreting that case as I interpreted it.

Finally, it is contended that the attorney did not violate any order of the district court because he did not personally contact members of the subject class but merely assisted his client, the bank, in doing so. This is frivolous! A lawyer is retained by the client as the client's representative in the judicial process. The client may be bound not only by representations made by the lawyer to the court, but also by the court's directives to the lawyer acting on behalf of the client. Any theory to the contrary would necessitate, in addition to the appearance of counsel, the appearance of each client before the court. Such a rule would be unworkable. It is emphatically rejected.

In summary, I conclude that what may well have been intended as a directive issued by the district judge in this case was, through no fault of the judge, unclear. Although I should prefer that one exercising the prerogatives, and assuming the heavy responsibilities of a trial lawyer deal more forthrightly with the court, I do not join in affirming sanctions levied for violation of that directive. To that extent, I respectfully DISSENT.

---

1. At whose door may the confusion attending Judge Evans' direction with respect to the contact of potential class members be laid? I believe it was the responsibility of the lawyer seeking the court's protection from that contact to request of the court a clear directive. That was not done. And yet, as I cannot fault this earnest and even-handed judge, seeking to pass upon innumerable issues in a complex and quickly moving case, I cannot fault an advocate for overlooking the fact that a directive of the court was phrased with less than absolute clarity. Ours is a human system, striving to be fair. We can expect no more than that.