**Rollin HAFFER, et al.**

v.

**TEMPLE UNIVERSITY OF the COMMONWEALTH SYSTEM OF HIGHER EDUCATION, et al.**

**Civ. A. No. 80–1362.**

United States District Court, E.D. Pennsylvania.

March 2, 1987.

---

See also, 7th Cir., 688 F.2d 14.

Arthur Bryant, Trial Lawyers for Public Justice, Ellen Vargyas, Nat. Women's Law Center, Washington, D.C., for plaintiffs.

Stephen Bosch, Mary Ellen Krober, Philadelphia, Pa., for defendants.

## MEMORANDUM

JOSEPH S. LORD, III, Senior District Judge.

### BACKGROUND

This is a class action alleging unlawful gender discrimination in Temple University's intercollegiate athletic program. The plaintiff class consists of "[a]ll current women students at Temple University who participate, or who are or have been deterred from participating because of sex discrimination in Temple's intercollegiate athletic program." The parties have engaged in lengthy and voluminous discovery. In October 1986, class counsel Arthur Bryant began to schedule meetings with women's intercollegiate athletic teams. Plaintiffs allege that certain communications from Temple to class members and potential witnesses have discouraged

class members from meeting with Bryant. Presently before me is plaintiffs' motion to remedy, prohibit and impose sanctions for defendants' unethical and improper communications with plaintiff class members and potential witnesses ("plaintiffs' motion"). An evidentiary hearing was held on December 19 and December 23, 1986. After careful consideration of the evience and numerous briefs, I conclude that defendants' actions were improper, and will order appropriate remedies and sanctions.

## FACTS

Bryant began to arrange and hold team meetings in October 1986. Members of different teams asked their coaches whether they were required to attend these meetings. Most coaches simply stated that it was up to each individual to decide whether to attend the meetings. At least one coach mistakenly instructed his team that "they were free to meet with [class counsel] ... but that Temple's attorneys have the right to be present at any such meeting." Affidavit of Peter Daub (head coach of the women's tennis team). Daub also asked team members to inform Temple when any meeting was scheduled. After learning that an assistant basketball coach made comments that allegedly dissuaded class members from attending a meeting scheduled for October 27, 1986, Bryant contacted Temple University's Associate Counsel, Stephen Bosch. Bryant informed Bosch of the basketball coach's comments, and requested that Bosch inform the coaches that Bryant was scheduling team meetings. Bryant asked Bosch to tell the coaches not to discuss the meetings, or the lawsuit, with class members. Bosch promised to investigate the matter.

Later that day, Bosch called Bryant and proposed that Temple communicate with class members regarding the lawsuit and meetings. Bosch read a draft memo to Bryant, and suggested that Eve Atkinson distribute the memo at team practice sessions. Atkinson is Associate Director for Women's Intercollegiate Athletics and a named defendant. Bryant strongly objected to dissemination of the memo. He told Bosch that the memo was "misleading and inaccurate in several respects, that it would seriously disrupt [Bryant's] ability to meet and communicate with plaintiff class members, and that distribution of the memo would constitute a serious ethical violation." Plaintiffs and defendants' stipulations of fact in regard to plaintiffs' motion to remedy, prohibit and impose sanctions for defendants' unethical and improper communications at 2 ("stipulations"). Bryant understood that the memo would not be distributed over his objections. Stipulations at 2.

Nonetheless, at Bosch's direction and with Bosch's knowledge, stipulations at 2, Atkinson distributed the memo at team meetings held on October 27, 29 and 30, 1986. Atkinson also made a brief statement concerning the lawsuit to class members, see Affidavit of Eve Atkinson ("affidavit"), and "solicited and responded to questions from the athletes present." Stipulations at 2.

Bosch did not send a copy of the memo to Bryant. Bryant learned of the memo when a class member forwarded a copy, approximately nine days after distribution. Bryant called Bosch to demand that such communications stop, and to ask how Bosch proposed to remedy the memo's alleged effect of discouraging class members from meeting with Bryant. Bosch suggested that both attorneys address the women's basketball and tennis teams. After Bryant rejected this suggestion, Bosch stated that he would speak to the teams even if Bryant was not present.

At Bryant's request, I held a phone conference on November 7, 1986. After counsel outlined the above facts, I ordered that Bosch have no further communications with plaintiffs regarding the subject matter of this lawsuit.

## THE HEARING

At the hearing on the instant motion, plaintiffs sought to prove that Atkinson's remarks, made while distributing the memo, were inaccurate, and discouraged

class members from meeting with class counsel. However, despite valid service of a subpoena, Atkinson was not present at the hearing. The events leading to Atkinson's absence warrant discussion.

On December 10, 1986, class counsel deposed Atkinson. Bosch prohibited inquiry into the subject matter of the instant motion. In so doing, Bosch acted without a suggestion of legal authority to support him. On December 11, 1986, Bryant informed Bosch that plaintiffs wanted to question Atkinson at the hearing on plaintiffs' motion scheduled for December 19, 1986. Bosch said that he would produce Atkinson and that a subpoena would not be necessary. On December 12, 1986, Bryant wrote to Bosch to confirm that a subpoena would not be necessary to secure Atkinson's presence at the hearing. On December 16, 1986, Bosch informed class counsel that Atkinson would be unable to attend the hearing. Counsel discussed the possibility of scheduling Atkinson's deposition. Plaintiffs' counsel was unable to come to Philadelphia for a deposition but offered to take the deposition in Washington, D.C. at Atkinson's convenience. Bosch refused to schedule a Washington, D.C. deposition. On December 16, 1986, plaintiffs served a subpoena compelling Atkinson's appearance at the hearing.

On December 17, 1986, Bosch informed class counsel that he was planning to file a motion to quash the subpoena. Class counsel renewed their offer to depose Atkinson in Washington, D.C. Bosch did not consider this to be a "serious" proposal, and no deposition was scheduled. On December 18, 1986, Bosch served a motion to quash on plaintiffs' local counsel. On December 19, 1986, the morning of the hearing, Bryant received this motion. At the hearing, I attempted to investigate Bosch's role in Atkinson's decision to ignore the subpoena. It became evident that, at the very least, Bosch acquiesced in Atkinson's decision not to attend the hearing. Bosch's

behavior, in this regard, was inexcusable. I granted plaintiffs' oral motion that adverse inferences be drawn from Atkinson's failure to appeal. Class counsel submitted an "offer of proof in regard to testimony of Eve Atkinson" in support of their claims regarding Atkinson's remarks to class members. Plaintiffs state that Atkinson distributed a memo, entitled "LOYALTY," to all coaches and staff of the women's intercollegiate athletic department at her first staff meeting.[1] The memo reveals that Atkinson has extraordinarily strong feelings concerning institutional loyalty. Further, as Atkinson stated in her affidavit, she believes that the named plaintiffs have "long since abandoned [Temple] University" and that Bryant has attempted to "turn [class members] against Temple University." Affidavit at 5.

Moreover, as an administrator and "as a woman, [Atkinson has] taken great pains ... to ensure that female student athletes receive treatment equal to the male student athletes." Affidavit at 5. Accordingly, plaintiffs claim Atkinson deeply resents plaintiffs' attempt to establish that Temple is guilty of gender discrimination, and considers this action a personal and unwarranted attack on her and Temple University. Plaintiffs claim that as Atkinson distributed the memo, and delivered her remarks, she conveyed the "clear impression" that she and the University "did not want the plaintiff class members to meet with their counsel."

Bryant testified that scheduling team meetings went "smoothly" before the memo was distributed. He stated that before the memo was distributed not one athlete he contacted declined to meet with him. However, after distribution of the memo, it became increasingly difficult for Bryant to "maintain communications with, let alone meet with, members of the plaintiff class." Scheduled meetings were cancelled. Class members who previously

---

**1.** The memo states: "If you work for a person, in heavens name work for them: speak well of them and stand by the institution they represent.... [I]f you must growl, find fault, and condemn, resign your position and when you are on the outside, damn to your heart's content, but as long as you are part of the institution do not condemn it...."

"talked freely" with Bryant told him, after distribution of the memo, that they "were no longer comfortable talking" with him. Bryant testified that class members told him that, as a result of the memo and Atkinson's remarks, it would be difficult to arrange team meetings. Class members told Bryant that female student-athletes interpreted the memo and Atkinson's remarks as Temple's way of informing student-athletes not to meet with class counsel.[2]

Bryant's testimony gave rise to another incident that merits discussion. Pursuant to court order, and over his strenuous objection, Bryant revealed the names of five class members who told him that the memo had discouraged class members from meeting with him. On December 22, 1986, Bosch called at least two of these students. Defendants state that these calls were made to learn whether the students were at Temple, the students' addresses in order to serve subpoenas, and whether the students had an exam the date of the hearing. *See* Defendants' reply brief to plaintiffs' brief on sanctions. The students testified that the calls included discussions regarding the lawsuit.

## DISCUSSION

Bosch's memo, and Atkinson's remarks, violated the Code of Professional Responsibility (CPR) and the Local Rules of this court. In addition, they were false and misleading in several respects. Bosch's phone calls to class members violated the CPR, the Local Rules and my order of November 7, 1986.

Disciplinary rule 7–104(A) of the CPR provides:

> During the course of his representation of a client, a lawyer shall not:
>
> (1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the

lawyer representing such other party or is authorized by law to do so.

As set forth in Rule 14 of the Local Rules of the United States District Court for the Eastern District of Pennsylvania, the CPR is a part of the standard of conduct required of lawyers practicing before this court. Bosch's conduct was a flagrant and inexcusable violation of professional standards.

In addition to violating the CPR, the memo was false and misleading in several respects. The memo inaccurately describes the plaintiff class as consisting of "female student-athletes who believe that Temple University has unlawfully discriminated against them by favoring the male student-athletes. All female student-athletes are members of this 'class.'" As mentioned above, the plaintiff class includes not only current female student-athletes, but also female students who are, or have been deterred from participating because of gender discrimination in Temple's intercollegiate athletic program.

The memo states that "[t]he attorney who represents this class ... is Arthur Bryant, Esquire." In fact, Mr. Bryant of the Trial Lawyers for Public Justice, P.C., is not the only attorney representing the plaintiff class. Plaintiffs are also represented by lawyers from the National Women's Law Center, including Ellen Vargyas and Marcia Greenberger, and local counsel William Hangley of Hangley, Connelly, Epstein, Chicco, Foxman and Ewing. The memo falsely conveys the message that plaintiffs are represented by just one lawyer. This seriously understates the legal personnel and resources working on plaintiffs' behalf.

The memo also states:

> Because [Bryant] represents those [female] student-athletes, he has the right to contact them and ask them to meet with him. Any female student-athlete who wishes to meet with Mr. Bryant is free to do so....

---

2. The student-athletes' hearsay testimony was admitted for limited purposes.

Any female student-athlete who does *not* wish to meet with Mr. Bryant is free not to meet with him. The choice is yours. However, because the male student-athletes are not included in this class, [they] are asked not to meet with or discuss this lawsuit with Mr. Bryant ... without having first contacted my office.

If any student-athlete, male or female, has any questions about this matter, please call Eve Atkinson, Associate Director of Athletics, at 787-8794. (Emphasis in original).

It is, of course, correct that each student athlete is free to decide whether to meet with counsel. However, the clear import of the memo is that Temple prefers that its student athletes not meet with class counsel. The memo emphasizes the fact that class members are free *"not"* to meet with Bryant. The memo's message is reinforced by the request that male student athletes, who are potential witnesses, not meet with Bryant without first contacting the University. This message is further reinforced by urging class members to communicate with Atkinson, rather than their own attorneys. This invites continued violations of the prohibitions against communications with an opposing party. I find that this memo was intended to discourage class members from meeting with class counsel.

Atkinson's remarks were made at Bosch's direction, and constitute a further violation of the Code of Professional Responsibility, which prohibits a lawyer from causing others to communicate with opposing parties. Atkinson misidentified the plaintiff class as consisting of "all the present female student-athletes and all future female student-athletes." Affidavit at 3. Atkinson identified Mr. Bryant as "the attorney for the plaintiffs in this lawsuit." Affidavit at 3. As mentioned above, this misrepresents the legal personnel and resources at plaintiffs' disposal. Although Atkinson told class members that "[y]ou must decide for yourselves whether or not to meet with Mr. Bryant," affidavit at 4, there is no question that she feels that named plaintiffs have "abandoned" the University, believes that the instant action is meritless, and possesses and communicates an extraordinary commitment to institutional loyalty. I find that Atkinson's remarks were designed to discourage class members from meeting with class counsel.

Upon consideration of Bryant's uncontradicted testimony, the memo, and Atkinson's remarks, I find that defendants have improperly communicated with and discouraged plaintiffs from meeting with class counsel.

In addition, at least two coaches have made remarks that may have discouraged class members from meeting with class counsel. The head women's tennis coach told the assembled team that Temple's attorneys had the right to be present at any team meeting with class counsel. This is, of course, a gross misstatement, and may very well have dissuaded team members from scheduling a meeting with Bryant. It also illustrates the danger of non-lawyers discussing the legal aspects of the case with class members.

A class member approached Kenneth Anderson, head coach of the women's gymnastics team, and stated that Bryant told her that the men's gymnastics team budget was larger than that of the women's gymnastics team. Anderson "advised her that such was not the case, but, rather, the women's gymnastics team had a larger budget than the men's." Affidavit of Kenneth Charles Anderson at 2. Without deciding which team's budget is larger, which may be an issue at trial, I note that stipulated budget documents reveal that the total annual budget of the men's gymnastics team exceeded that of the women's team by over $22,000 in 1984-85; by approximately $7,000 in 1985-86; and by over $2,500 in 1986-87. Stipulations, Exhibits F-J. As plaintiffs' complaint is grounded in an alleged unequal distribution of resources in the men's and women's intercollegiate athletic programs, Anderson's remarks may well have dissuaded class members from meeting with class counsel.

Defendants contend that any communications were simply responses prompted by inquiries from class members. This may be true with respect to the remarks of Peter Daub and Kenneth Anderson. However, Bosch sent the memo to all student-athletes on his own initiative. Atkinson distributed the memo and delivered her remarks on her own and at Bosch's initiative. Finally, Bosch's December 22, 1986 phone calls to class members were made upon his own initiative.

In addition to Bosch's repeated violations of the Code of Professional Responsibility, and disregard for this court's order of November 7, 1986, I would be remiss if I did not comment on Bosch's conduct regarding Atkinson's subpoena. I attempted to determine Bosch's role in Atkinson's decision to ignore the subpoena. Bosch's representations were, at best, evasive. It is clear that, at the very least, Bosch implicitly endorsed Atkinson's decision not to appear at the hearing. A less generous interpretation would find that Bosch encouraged Atkinson's conduct. In either event, his behavior exhibited bad faith, complicated and prolonged these proceedings, and was, in a word, inexcusable.

Finally, Bosch's December 22, 1986 communications with class members constituted a bad faith violation of my November 7, 1986 order and the Code of Professional Responsibility. It is almost inconceivable that, in the midst of a hearing regarding improper communications with class members, Bosch would initiate further communications with plaintiffs. I cannot accept the justifications offered for these communications. Temple's counsel could have discovered the addresses of Temple students by the simple expedient of consulting school records. Bosch's testimony, in this regard, was not credible; his behavior intolerable.

### REMEDIES

Based on the facts outlined above, I find that defendants have improperly communicated with class members, and that Temple has discouraged class members

from meeting with class counsel. In light of these findings, I have "both the duty and the broad authority ... to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 2200, 68 L.Ed.2d 693 (1981). I will grant plaintiffs' requests that the court send a corrective notice to all female student-athletes. Plaintiffs' counsel will submit to the court a proposed notice with copy to defendants' counsel. The notice, when approved, shall be distributed at defendants' expense. I will also award plaintiffs the costs and attorneys' fees resulting from defendants' improper communications and thwarting of discovery, the amounts to be determined after a hearing. I will prohibit future improper communications. Finally I will impose a substantial sanction against defendants and their counsel. However, I deny plaintiffs' requests that a corrective notice be sent to male student-athletes and coaches, and that defendants be prohibited from deposing class members.

Pursuant to Federal Rule of Civil Procedure 23(d)(2), I have explicit authority to require "for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action." Courts often issue protective orders after parties initiate improper communications with class members. *See, e.g.,* *Tedesco v. Mishkin*, 629 F.Supp. 1474 (S.D. N.Y.1986) (corrective notice sent after defendant improperly communicated with class members); *Impervious Paint Industries, Inc. v. Ashland Oil*, 508 F.Supp. 720 (W.D.Ky.), *appeal dismissed*, 659 F.2d 1081 (6th Cir.1981) (same); *In re Federal Skywalk Cases*, 97 F.R.D. 370 (W.D.Mo. 1983) (same).

However, the record before me does not support plaintiffs' request that a corrective notice be sent to male student-athletes and coaches. Plaintiffs have failed to present any evidence suggesting that male student-athletes and coaches have been discouraged from meeting with

plaintiffs' counsel. Indeed, there is no evidence that class counsel has even attempted to meet with male student-athletes or coaches. Corrective notices are sent when a party effectively orders, threatens or coerces potential witnesses not to meet with opposing party's counsel. *See, e.g., Vega v. Bloomsburgh,* 427 F.Supp. 593 (D.Mass.1977); *Rodriguez v. Percell,* 391 F.Supp. 38 (S.D.N.Y.1975); *United States v. City of Milwaukee,* 390 F.Supp. 1126 (E.D.Wis.1975). Temple's *request* that male student-athletes contact the University before meeting with plaintiffs' counsel does not require a corrective notice. Of course, Temple may not effectively deny access to potential witnesses. I will not hesitate to impose severe sanctions if plaintiffs establish that defendants have interfered with class counsels' ability to meet with potential witnesses.

An order prohibiting future improper communications is obviously necessary. The evidence establishes that defendants' counsel, administrators and coaches have disseminated false and misleading information to plaintiffs. Neither court orders, the local rules nor the Code of Professional Responsibility have tempered defendants' counsel's enthusiasm for improper communications with class members. Defendants and their counsel are on notice that violation of this order will result in substantial sanctions.

Defendants argue that *any* restraint on communications from defendants to class members would violate plaintiffs' First Amendment rights. Courts have repeatedly rejected this assertion; "[i]n the realm of litigation, a fair and just result *often* presupposes restraints on the speech of the parties." *Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193, 1206 (11th Cir. 1985) (emphasis added). *See also Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) (discussing variety of ways First Amendment rights may be "subordinated" during litigation).

Generally, a court order "limiting communications regarding ongoing litigation between a class and class opponents will satisfy first amendment concerns if it is grounded in good cause and issued with a 'heightened sensitivity' for first amendment concerns." *Kleiner, supra,* 751 F.2d at 1205 (citing *In re San Juan Star Co.,* 662 F.2d 108, 116 (1st Cir.1981)). I am aware that, as a practical matter, defendants and class members necessarily interact daily, and must communicate for the University to properly serve its student body. Nevertheless, I cannot allow false and misleading information to continue to interfere with this action. The order that follows is narrowly drawn to avoid any undue restriction on speech.

Defendants shall not be permitted to benefit from their improper communications. For this reason, I shall order that Bosch provide to class counsel any documents concerning his December 22, 1986 communications with class members.[3] Similarly, any documents prepared by Atkinson, any other named defendant, or defendants' counsel regarding conversations with class members concerning the subject matter of this action, occurring after distribution of the memo, shall be provided to plaintiffs' counsel.

Defendants' and their counsel's conduct justifies the imposition of a substantial fine. "[I]ndulgent toleration of lawyers' misconduct is simply a luxury the federal court system can no longer afford." *Eash v. Riggins Trucking Co.,* 757 F.2d 557, 565 (3d Cir.1985) (Adams, J.). As discussed above Bosch's memo violated the CPR and the Local Rules of this court, and contained false and misleading information. Atkinson's remarks similarly violated the CPR and Local Rules, and contained false and misleading information. At least one Temple coach provided his team with incorrect information concerning plaintiffs' rights. Bosch's conduct, with respect to the sub-

---

**3.** Although defendants do not raise the issue in their reply brief to plaintiffs' brief on sanctions, I note that the work-product doctrine does not bar production of these documents. Simply put, "[t]hat doctrine was ... not designed to immunize materials obtained through improper ... preparation activities." *Resnick v. American Dental Ass'n,* 95 F.R.D. 372, 379 (N.D.Ill.1982).

poena, was in bad faith and inexcusable. Finally, Bosch's improper communications of December 22, 1986 constituted a bad faith violation of a court order and the applicable ethical norms.

Defendants' and their counsel's conduct has interfered with plaintiffs' counsel's ability to prepare this case for trial, necessitated a two-day hearing, resulted in the filing of plaintiffs' motion, defendants' reply to plaintiffs' motion, plaintiffs' reply memorandum, defendants' supplemental memorandum of law, plaintiffs' reply to defendants' supplemental memorandum of law, plaintiffs' brief on sanctions, and defendants' reply brief to plaintiffs' brief on sanctions, consumed an inordinate amount of the court's and of counsels' time, and undoubtedly delayed the trial of this already six-year-old case. Needless to say, none of this would have been necessary if defendants' counsel had not acted improperly.

I need not reach the question of whether Bosch's conduct constitutes contempt of court; "[t]he Supreme Court has consistently recognized the federal court's powers . . . to sanction errant attorneys financially both for contempt and for conduct not rising to the level of contempt." *Eash, supra,* 757 F.2d at 566. *See also Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (affirming the "well-acknowledged" inherent power to levy sanctions in response to abusive litigation practices); *Kleiner, supra,* 751 F.2d at 1207–10 (upholding $50,000 fine imposed without a finding of contempt); *Tedesco, supra,* 629 F.Supp. at 1486 (punitive sanction of $10,000 for false and misleading communications to class members; no finding of contempt).

■ Defendants argue that contempt sanctions are inappropriate, as the memo was distributed before my November 7, 1986 order, and because defendants' counsel had "no notice or opportunity to defend" concerning the December 22, 1986 communications. These arguments are fatuous. The imposition of sanctions does not rest upon my power to hold counsel in contempt. Moreover, as plaintiffs' motion requested that a $10,000 fine be assessed, defendants were on notice that monetary sanctions might be imposed. Bosch testified at the hearing, and was given more than ample opportunity to explain his behavior, not only with respect to the memo, but also in connection with Atkinson's remarks, Atkinson's failure to obey the subpoena, the obstruction of Atkinson's December 10, 1986 deposition and the refusal to reschedule another deposition, and the December 22, 1986 communications with plaintiffs. Further, Bosch cross-examined two plaintiffs he called on December 22, 1986. In addition, defendants filed a brief specifically addressing the issue of sanctions. Therefore, the sanctions I will order do not violate due process. *See Eash, supra,* 757 F.2d at 570; *Kleiner, supra,* 751 F.2d at 1209–10. *See also In re Allis,* 531 F.2d 1391 (9th Cir.), *cert. denied,* 429 U.S. 900, 97 S.Ct. 267, 50 L.Ed.2d 185 (1976) (due process not violated when counsel had ten minutes notice and opportunity to be heard before being found in contempt).

■ Finally, plaintiffs request that defendants be prohibited from deposing class members. Plaintiffs rely upon my authority under Federal Rules of Civil Procedure 11 and 26, and this court's inherent authority and contempt power. Although I possess the power to grant plaintiffs' request, I decline to do so. The various remedies fashioned above are specific responses to defendants' actions. The corrective notices, court order, and award of costs and attorneys' fees are narrowly drawn remedies in response to improper communications. Financial sanctions will be imposed for past improper conduct, and as a deterrent to future violations of this court's orders and applicable ethical norms. Prohibiting depositions of class members is not a narrowly drawn response to defendants' improper conduct, and could severely prejudice defendants' trial preparation. A primary purpose of this memorandum is to ensure that neither party's trial preparations are improperly impeded by their adversary. For this reason, the depositions

already agreed to by the parties shall proceed.

An appropriate order follows.