Nicholas J. ROMANO and Deborah A. Morgan, Plaintiffs,

v.

SLS RESIDENTIAL INC., SLS Health Inc., SLS Wellness, Inc., Supervised Lifestyles, Inc., Joseph Santoro, Alfred Bergman, Shawn Prichard, Matt Sena, Robert Giordano, Gabe Caputo, Robert Deletis and John Doe 1, Defendants.

No. 07 Civ. 2034(SCR).

United States District Court, S.D. New York.

Sept. 23, 2008.

Michael Howard Sussman, Sussman Law Offices, Goshen, NY, for Plaintiffs.

James F. Segroves, Malcolm J. Harkins, III, Margaret Joann Babb, Proskauer Rose LLP, Washington, DC, Marc Robert Wilner, Paul F. Callan, Callan, Koster, Brady & Brennan LLP, New York, NY, Gerald Lawrence, Richard Wolfe Cohen, Lowey Dannenberg Cohen & Hart, P.C., White Plains, NY, for Defendants.

## DECISION AND ORDER

STEPHEN C. ROBINSON, District Judge:

Nicholas J. Romano, and Deborah A. Morgan, the plaintiffs, bring this class action

lawsuit against SLS Residential Inc., SLS Health Inc., SLS Wellness, Inc., and Supervised Lifestyles, Inc., (collectively referred to as "SLS"), a private mental health facility and some of its principals and employees who are alleged, among other things, to have physically and mentally abused its resident-patients. Defendant SLS, is a private mental health facility that provides residential and out-patient services to young adults with mental illnesses.[1] The certified class is defined as "persons who resided at SLS between July 2004 and May 31, 2006." Defendants Joseph Santoro and Alfred Bergman are owners of SLS. Defendant Shawn Prichard is a licensed psychologist and the Chief Clinical Officer of SLS. The remaining Defendants, Matt Sena, Robert Giordano, Robert Deletis, and John Doe, are employees of SLS. The complaint asserts claims of discrimination under New York Executive Law § 296, breach of fiduciary duty, and intentional and negligent infliction of emotional distress based on allegations that rather than maintaining a program focused on rehabilitation, the Defendants engaged in a pattern of behavior whereby they illegally assaulted, restrained, punished, and isolated patients.

For the following reasons and based on the following findings of fact, the Court finds that the Defendants have engaged in abusive, deliberate, and improper conduct during the opt-out period by communicating false and misleading information to the putative plaintiff class members and their parents and families, in a concerted attempt to scare them into opting out of this lawsuit, and that the Defendants' behavior warrants an order from this court: 1) prohibiting SLS and any of its employees or agents from communicating with putative class members during the opt-out period *about this lawsuit* without the express permission of this Court; 2) determining that all opt-outs from this class action are void and that corrective notices shall be sent asking those class members who opted out to affirm that decision once the false and misleading information provided by SLS and its employees is corrected; and 3) imposing severe monetary sanctions.

## I. Findings of Fact

Notice letters were sent to putative class members to inform them of the pendency of this lawsuit and to instruct them on how to opt out of the class if they chose not to participate in the lawsuit. The letters, which were agreed upon by the parties and this Court, were signed and sent out by the Court. Shortly after the notice letters were mailed, Plaintiffs' counsel informed the Court that he had received troubling phone calls from several putative class members. One call came from a parent of a putative class member who expressed concern about the confidentiality of her daughter's medical records. After counsel assured her that the records would be kept confidential, she called back and said she had "received word" that counsel's assurances were wrong and that, if her daughter did not opt out, her records would be made public.

Counsel also received a call from a putative class member, Mr. L.[2] Mr. L told counsel that a Dr. Lombardo from SLS called his father and advised him that if Mr. L did not opt out of the lawsuit, his medical records would be publicized and he would be embarrassed. Mr. L understood the call to be an attempt by SLS to convince him to opt out of the lawsuit, and he expressed an expectation that they would use the same tactics with other putative class members.

Counsel received several other similar phone calls. Ms. H. informed counsel that she had been released from SLS two years prior, had no contact with SLS since her release, and that she had screened a call from SLS, choosing not to pick up. Ms. K. stated that SLS had called her twice and that she also had chosen not to pick up because she had been disassociated from SLS since 2004, they had no reason to be contacting her, and she felt that the call was improper and likely an attempt to persuade her to opt out of the class. Counsel also received a call from Ms. P., whose son is a putative class

---

1. The State of New York's Office of Mental Health recently revoked SLS's operating licenses. The matter is stayed pending SLS's appeal.

2. Initials will be used to protect the identity of putative class members.

member, Ms. P. stated that someone from SLS had called her son and told him that his medical records would be released if he did not opt out of the class. Class counsel also informed the court that a potential class member who is in out-patient treatment with an SLS therapist had been told by that therapist that if she did not opt out, she would be refused treatment. Tr. at 102.

Plaintiffs' counsel also received an e-mail, which he provided to the Court, from Ms. Barbara J. Claire, Esq., the Legal Director for Connecticut's Department of Children and Families (DCF). Neither Ms. Claire nor DCF had any prior connection to or knowledge of this lawsuit. Ms. Claire stated that several employees at her agency had received phone calls from Al Bergman, a Defendant in this case, asking that they sign opt out notices on behalf of class members who were receiving services from DCF. In addition, Ms. Claire stated that she had received a voicemail from Anne Louise Blanchard, an attorney at Connecticut Legal Services. Ms. Blanchard stated that she had received a call from Mr. Bergman, who told her that a federal judge had ordered that all of their clients' psychiatric records be made public. This Court, of course, had made no such order.

The Court's chambers also received an irate phone call from a potential class member who had been told that the Judge had made certain decisions in the case to release the patient's information to the public. After learning of the above developments and receiving the aforementioned phone call, the Court conducted a telephone conference with Plaintiffs' counsel and an attorney of the law firm representing Defendant SLS. During that phone conference, the Court scheduled a hearing and instructed Defense counsel to produce at the hearing a list of any putative class members who had been contacted by the Defendants, the names of the people who had made the calls to class members, the names of the individuals who had directed the calls to be made, and the dates and times of the phone calls.

At the hearing on July 8, 2008, Defense counsel provided an incomplete list. According to that list and subsequent updates provided by Defense counsel, the Defendants contacted 80 putative class members or their family members. The list and the testimony at the hearing establishes that virtually all of those calls were made by SLS therapists, including Defendant Prichard.[3] Tr. at 32. There were 252 putative class members to whom notice letters were mailed. Of the 67 putative class members that opted out in this case, 37 were on the list of class members contacted by the Defendants.

Counsel for the Defendants informed the Court that, prior to any telephone calls to the putative class members, they had issued a memorandum to the Defendants advising them not to have any contact with any prospective class member and that, if such contact should occur, the Court may impose sanctions on them for their conduct. Tr. at 10–11, 15. Counsel further stated that when SLS received phone calls from potential class members regarding the lawsuit, and SLS employees who answered the phone at times engaged the potential class members in conversations about the lawsuit rather than simply state that they could not discuss that matter with them. Tr. at 10. Defense counsel also acknowledged that the Defendants told various potential class members that their records would be made public should they remain in the class, apparently on the basis that no confidentiality order had yet been entered. Tr. at 11–12.

At the hearing, Dr. Lombardo, a therapist who is licensed by the New York State Office of Mental Health through the Psychology License Board and has been employed by SLS for over two years, was called to testify. Tr. at 43. Dr. Lombardo testified that on July 2, he had attended a meeting that Defendant Dr. Shawn Prichard called amongst the therapists. Tr. at 45. At that meeting, the therapists discussed calling the potential class members or their families. Tr. at 44–45, 51. There was no attorney present. Tr. at 45.

---

**3.** The list also indicates that Defendants Bergman and Deletis each contacted a putative class member as well, and though not included on the list, this Court has found that Defendant Bergman contacted DCF and Connecticut Legal Services as indicated in the email from Ms. Claire.

Subsequent to that meeting, Dr. Prichard provided Dr. Lombardo, and all the other therapists, with a list of the names, addresses, and phone numbers for those potential class members who were believed to be former patients of that particular therapist. Tr. at 46. The list was compiled from SLS records. Tr. at 46. Out of the approximately twelve names on Dr. Lombardo's list, six were individuals whom neither Dr. Lombardo nor any other SLS therapist was treating at the time the list was prepared or at the time of the subsequent contact—in other words, former patients who no longer had a relationship with SLS. Tr. at 47–48. Some individuals on the list were not actually former patients of Dr. Lombardo. Tr. at 84. Dr. Lombardo testified that he chose not to contact certain people on his list with whom he felt he "didn't have that kind of relationship" or who he expected would respond hostilely toward the contact. Tr. at 85.

During these calls, Dr. Lombardo gave people his opinion and advice regarding what would happen if they remained a member of the class. Tr. at 50, 56. He told the class member or family member he spoke to that he or she would be receiving a letter regarding this lawsuit and that the member would be called to court. Tr. at 57, 63. Dr. Lombardo told at least one member, or member's family member, that the class member's records would be made public if the member participated in the lawsuit because he would have to discuss their medical histories in open court. Tr. at 50–51; 58–59. Corroborating what class counsel had told the Court, Dr. Lombardo testified that he did indeed speak to Mr. L's father and indicate that, if Mr. L. participated in the lawsuit, his medical records might become public. Tr. at 91–92. Dr. Lombardo, who has no legal background, made these statements based purely on the discussion had while meeting with the other therapists. Tr. at 51–52; 56; 58–59, 60. These meetings conducted at SLS were held without the presence or advice of any legal counsel.

When asked by the Court whether the purpose of the phone calls was to get the class members to opt out, Dr. Lombardo testified that that was not "*completely*" the purpose and that the point was also to let the class member or their family member who received the letter know that they had to affirmatively take steps to opt out of the lawsuit. Tr. at 65. While sheepishly stating that he didn't *try* to influence the members' decisions, Dr. Lombardo admitted that class members were told only potential, unconfirmed (and as it turns out wholly inaccurate) negative consequences of participating in the lawsuit and not any potential positive effects that membership in the class might have for them or their families. Tr. at 65–67.

## II. Discussion

"Class actions serve an important function in our system of civil justice. They present, however, opportunities for abuse as well as problems for courts and counsel in the management of cases." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99–100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). Due to this potential for abuse, district courts are "empowered ... to restrict certain communications in order to prevent frustration of the policies of Rule 23," which governs federal class actions. *Id.* at 102, 101 S.Ct. 2193 (quoting *Coles v. Marsh,* 560 F.2d 186, 189 (3rd Cir.), *cert. denied,* 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977)). Orders restricting communications must be "based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101, 101 S.Ct. 2193. A court issuing such an order must also find that the relief ordered would be consistent with the policies of Rule 23 and that the scope of the order "limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Id.* at 101–02, 101 S.Ct. 2193. Courts have found abusive communications warranting such an order to include communications that affect class members' decisions regarding whether to participate in the litigation, communications that undermine class members' confidence in class counsel or the court, and communications that contain false or misleading statements about the litigation. *See, e.g., In re School Asbestos Litig.,* 842 F.2d 671, 682–83 (3rd Cir.1988); *Kleiner v. First Nat'l Bank of Atlanta,* 751 F.2d 1193 (11th Cir.1985); *Tedesco v. Mishkin,* 629

F.Supp. 1474, 1482–84 (S.D.N.Y.1986); *Hampton Hardware, Inc. v. Cotter & Co.,* 156 F.R.D. 630, 632 (N.D.Tex.1994); *Haffer v. Temple University,* 115 F.R.D. 506, 512 (E.D.Pa.1987).

█ Abusive practices in litigation may also lead to the imposition of sanctions, monetary or otherwise, against the offending party. It is understood that Courts are vested with certain inherent powers necessary " 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)). These powers must be exercised with discretion. *Id.* at 44, 111 S.Ct. 2123. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 45, 111 S.Ct. 2123.

█ Based on the above facts, including the full testimony at the hearing before this Court, the testimony of Dr. Lombardo, the list compiled by defense counsel, and the communications made to my chambers and Plaintiffs' counsel, the Court finds that the Defendants have ignored the advise and counsel of their attorneys, improperly communicated with putative class members, severely abused the judicial process, and frustrated the purposes of Rule 23. Defendants related false and misleading information to putative class members about the consequences of their participation in this lawsuit and the actions of the Court. These communications interfered with putative class members' decisions regarding whether or not to participate in the class. Furthermore, they undermined potential plaintiffs' confidence in class counsel and their confidence in this Court.

The Defendants developed and executed a plan through which they sought to coerce putative class members to opt out of the class. In bad faith, they provided class members with patently false and misleading information about what this Court has done, what the Court will do and what will come to pass during the litigation of this case. Needless to say, there has been no order by the Court that all psychiatric records be made public, nor will there be; nor was there any basis from which to tell members of the class that should they remain in the class, their medical histories and records would be publicized.

To the extent that the Defendants seek to excuse their behavior by claiming that based on the memo issued by defense counsel, they believed it was permissible to contact putative plaintiffs' family members, even though they knew that it was impermissible to contact putative plaintiffs directly, this explanation is wholly unavailing. First, Defendants did not limit their contact to family members. Contact was in many cases made directly with the class members themselves. Defendants engaged in conversations about the lawsuit with any putative plaintiff calling to inquire, and Defendants took it upon themselves to call many others. Second, and furthermore, speaking to family members was merely a pretense for reaching the class members themselves—or, for that matter, any person that the Defendants believed could be persuaded to sign the opt-out notice on behalf of the class member, whether it be the class member himself, a family member, or an institution where that class member was being treated. But Defendants did not even stop with contacting class members or their families. They also contacted institutions that are involved with treating potential plaintiffs, seeking to convince them to sign opt outs on behalf of the potential class members and misinforming those institutions about what this Court has and has not done. As the Defendants well know, these institutions have no authority to sign opt out notices on behalf of their clients. Yet the Defendants were willing to speak to whomever it was that they believed could help them to achieve their goal of securing as many opt-outs as possible. They were willing to interfere in another institution's relationship with that institution's clients—essentially, seeking to use those other institutions as proxies for their scheme.

These calls were not the result of inadvertence, misplaced good intentions, or even the product of rogue employees who took it upon themselves to manipulate class members.

Rather, it was a scheme designed and implemented by the very highest managers at SLS who are, not incidentally, named Defendants in this lawsuit. Any argument that the aim of this scheme was not to persuade putative plaintiffs to opt out of the class is disingenuous and bootless. In an effort to exert the most effective influence over the plaintiffs, the Defendants strategized that each former patient's therapist—the one in the greatest position of trust, influence, and authority—would be the one to place the call. At least one therapist determined that he would not call all those class members whom he treated; instead, he weeded out potential class members whom he believed would not respond well to his pressure.

What was said during the phone calls was also an integral part of the strategy. As discussed at the therapist meeting, Defendants spoke only of supposed negative consequences that could flow from participation in this lawsuit. They were not to mention that this lawsuit may actually be a good thing for people with grievances against the Defendants. While Defendants fabricated and expounded on the negative effects of class membership, they chose not to mention any positive consequences that might result from membership in the class, such as the airing of grievances and the righting of wrongs. Considering the scheme that Defendants implemented, it is beyond dispute that they intended to interfere with class members' decisions regarding whether to participate in this lawsuit by painting a terrorizing picture of what such participation would entail. Moreover, their efforts were fruitful, as evidenced by the distressed communications made to Plaintiffs' counsel and the Court's chambers, and the number of opt-out notices that the Court received from putative plaintiffs the Defendants had contacted as compared to the percentage of opt-outs received from those who the Defendants were not able to reach prior to the discovery of the scheme. Defendants' conduct is even more astounding considering the nature of their relationship with the putative class members. The fact that the Defendants and specifically the therapists making the phone calls were mental health care providers to these individuals makes Plaintiffs more susceptible to their influence and increases the potential for coercion. Defendants exploited this sensitive relationship by implying that they disapproved of and discouraged participation in the lawsuit and, moreover, indicating that class members would be embarrassed by any information about them that came to light. Under the guise of looking out for their former patients' well-being, the Defendants developed and implemented a scheme designed to cause them distress all in order to serve their own ends of limiting potential liability. Not only were the Defendants willing to take advantage of their own relationship with the putative plaintiffs in order to achieve this end, but they were also willing to manipulate their former patients' relationships with other service institutions that hold similar positions of influence over them, such as DCF.

It should also be noted that just prior to the mailing of the first round of notice letters, the Defendants made a plea to the Court to utilize an opt-in procedure rather than an opt-out procedure because, as set forth in an affidavit of Defendant Prichard, Defendants were concerned about the fragile mental status of many putative Plaintiffs and the distress that they would be caused by simply receiving the notice letter in the mail. After considering the affidavit and the circumstances of the case, the Court ruled that an opt-out procedure would be appropriate. Defendants also asked that they be permitted to contact putative plaintiffs to forewarn them of the notice letter that they would be receiving from the Court. The Court denied that request. Defendants' counsel did, however, along with Plaintiffs' counsel, have the opportunity to comment on the notice letter to be sent, and the comments they made were incorporated. The fact that the Defendants then circumvented the process decided upon by the Court and schemed to give Plaintiffs' their own version of what this lawsuit will entail is deeply troubling. Moreover, the fact that the Defendants deliberately distressed those former patients, whose mental health they claimed to be concerned about and further claimed would be endangered simply by receiving a notice letter from the Court, to serve their own means—

all the while under the guise of seeking to protect those patients—is seriously disturbing.

The Defendants' bad faith communications created distress, misunderstandings, and fear among potential class members. This Court finds that by their improper acts, the Defendants, therapists and principals of a mental health agency with no legal training, have improperly interjected themselves into this lawsuit and defeated the purposes of Rule 23 by interfering with putative plaintiffs' decisions regarding whether to remain in the class. Under the guise of caring for their former patients, the Defendants sought to capitalize on the potential plaintiffs' vulnerability and discourage them from participating in the lawsuit. This conduct is astounding to the Court. The degree to which the Defendants successfully sought to interfere with the system of justice, diminish Plaintiffs' confidence in class counsel, and undermine the authority of this Court is difficult to overstate. This conduct cannot be overlooked.

## III. Remedies

■ At the conclusion of the hearing, the Court ordered that the Defendants and their agents are prohibited from contacting any potential plaintiffs in this case or their family members regarding this lawsuit. The limitations that such a restriction will place on their rights are minimal. Out of the 252 potential class members who were mailed notice letters, only 4 are current SLS residents. As to those class members, the Defendants of course may have contact with them to the extent that they must continue to provide services to whoever is in their care. There is no need whatsoever for them to have communications with them regarding this lawsuit, however. As for the former SLS patients who make up the vast majority of putative plaintiffs, the Defendants have no need to contact them at all, let alone regarding this lawsuit or the merits of their involvement in it. Thus, the Defendants will not be harmed by an order restricting their communications with potential class members or their families regarding this lawsuit without prior permission of this Court. While the harm to Defendants in being subjected to

such an order is minimal, the need for such an order is high in light of the facts discussed above and the actions that Defendants have proven themselves willing to take in order to avoid being subject to a fair judicial process. Moreover, this order is necessary to preserve the policies behind Rule 23. Plaintiffs must be able to make decisions regarding whether to participate in the class free from misinformation and coercion from Defendants.

■ To remedy this problem to the extent possible, the Court also ordered that all opt-outs received would be void and that a corrective notice be sent to the potential class members. All putative class members will receive a corrective notice that includes a copy of the confidentiality order that has since been stipulated to by the parties and entered by the Court in this matter. As for class members who opted out, the corrective notice will address the fact that their opt-out has been voided, and it will also include a letter from the Defendants acknowledging that they improperly communicated with putative class members regarding the confidentiality of their records. The costs incurred in sending these corrective notices are to be borne by the Defendants.

The final members of the class will be determined once this second round of corrective notice letters has been sent and the opt-out period set forth in those letters has expired. These measures are necessary to remedy the effect of Defendants' insidious behavior. This Court must take all reasonable efforts to correct any erroneous beliefs putative plaintiffs hold as a result of Defendants' conduct. Those potential plaintiffs who opted out based on inaccurate information they received from the Defendants or as a result of the Defendants' coercion must be given an opportunity to make the decision again. Hopefully, this passage of time, brief though it is, will allow for some of the corrosive effects of the Defendant's behavior to dissipate. For those class members who did not opt out, the corrective notice will serve the important function of ensuring that they are able to move forward in the litigation free from misconceptions created by the Defendants regarding the confidentiality of their records. Sending a corrective notice to

all putative class members and voiding the opt-outs received to date will serve these purposes.

■ This Court also finds that imposing a monetary sanction of $35,000 on the Defendants is warranted. The Defendants' abusive practices undermine the purposes of class action lawsuits and violate the integrity of the judicial process. The Court and our system of justice have effectively been circumvented. The progress of this litigation has been severely and needlessly disrupted. To the extent that the Defendants were in a position of power and trust over the potential plaintiffs, the Defendants in bad faith took full advantage of that position to manipulate the potential plaintiffs, this litigation, counsel, and the Court. This type of egregious conduct may not be tolerated. The Defendants are to pay the sum of $35,000 to the Clerk of the Court within 90 days of the entry of this order. The Defendants are also ordered to pay the costs and fees that plaintiffs' counsel has incurred in addressing the Defendants' abusive conduct. Plaintiffs' counsel is to submit documentation of those costs and fees for approval to the Court.

## IV. Conclusion

As a result of the Defendants' improper and abusive conduct, this Court orders that:

1) All opt-outs are void. Corrective notices are to be sent to putative class members as detailed above.

2) The Defendants and their agents are prohibited from having any further contact with putative class members or their families regarding this lawsuit, except for the purposes of providing any continuing treatment.

3) The Defendants are sanctioned the sum of $35,000.

*It is so ordered.*